2003 VT 34

# Mark W. King v. John Gorczyk, Commissioner, Department of Corrections

[825 A.2d 16]

No. 02-180

Present: **Amestoy, C.J., Dooley, Morse,**[1] **Johnson and Skoglund, JJ.**

Opinion Filed March 28, 2003

---

[1] Justice Morse was present when the case was submitted on the briefs but did not participate in this decision.

222

*Mark W. King,* Pro Se, Swanton, Plaintiff-Appellant.

*William H. Sorrell,* Attorney General, Montpelier, and *Douglas R. Marden,* Assistant Attorney General, Waterbury, for Defendant-Appellee.

¶ 1. **Skoglund, J.** Plaintiff Mark W. King, an inmate of the North West Correctional Facility ("NWCF") in Swanton, appeals from the superior court's denial of his cross-motion for summary judgment and grant of summary judgment in favor of defendant, commissioner of the Vermont Department of Corrections ("DOC"), dismissing plaintiff's claims contesting the propriety of the random drug test he underwent, the analysis and results of that drug test, and plaintiff's subsequent conviction for a disciplinary rule violation based on that drug test. We affirm.

¶ 2. Plaintiff is currently committed to the custody and control of the DOC based on a charge of second-degree murder. On the morning of July 11, 2000, plaintiff was selected for a random drug test and submitted a urine sample to a NWCF correctional officer for testing. An initial on-site test of plaintiff's sample indicated the presence of delta-9-tetrahydrocannabinol, the main active chemical in marijuana, otherwise known as THC. Plaintiff's urine sample was then sealed and sent to the

Vermont Department of Health Laboratory (the "Lab"). The Lab received plaintiff's sample on July 12, 2000.

¶ 3. Random drug testing is governed by DOC policy 367 and described in guidelines set forth in policy directive 367.01. In accordance with policy directive 367.01, the Lab conducted two tests on plaintiff's urine sample, a screening test followed by a confirming test, both utilizing "technologies having a 90% . . . reliability rating or any testing process approved by the federal courts for criminal prosecution." On July 18, 2000, the Lab performed the screening test, which confirmed the presence of THC in plaintiff's urine sample. Two days later, the Lab performed the confirmation test, which again demonstrated that plaintiff's urine sample contained THC. The Lab reported these positive test results to the DOC on July 20, 2000.

¶ 4. As a result of testing positive for THC, on August 2, 2000, plaintiff was charged with violating DOC disciplinary rule Major B#20 ("DR").[2] At a disciplinary hearing held on August 8, 2000, plaintiff was convicted of violating the DR by a preponderance of the evidence. The hearing officer based plaintiff's conviction on the incident report, offender drug testing report, chain of custody log, and the request for drug analysis form. As punishment, plaintiff received "2 days lock in," which was suspended for thirty days. Plaintiff was allowed to maintain his current employment, as well as visits with his children. Plaintiff appealed his DR conviction to the disciplinary board on August 20, 2000. His appeal was denied by the disciplinary board on September 4.

¶ 5. Pursuant to V.R.C.P. 75 (review of governmental action), plaintiff filed a complaint in superior court in September 2000, alleging that his due process rights were violated by the DOC's failure to follow policy directive 367.01 because the department failed to provide plaintiff with the actual laboratory reports of his drug test and failed to address plaintiff's claims on appeal with specificity at the disciplinary board level. Plaintiff also claimed that, because the actual laboratory reports of the screening and confirmation tests were not part of the evidence relied on by the hearing officer, there was insufficient evidence to convict him of the DR. Plaintiff later filed a motion to amend his complaint, arguing that because the DOC failed to properly promulgate policy directive 367.01 pursuant to the

---

[2] A Major B#20 violation is defined in DOC policy directive 410.01 as "[p]ossession, introduction or use of any alcohol, narcotics, depressants, stimulants, hallucinogenic substances or marijuana . . . or related paraphernalia not prescribed for the individual by the medical staff." Recommended sanctions include placement in disciplinary segregation for zero to fifteen days, loss of good time for zero to three days, loss of privileges within the offender's classification for zero to thirty days, and/or institutional community service or reparation.

Vermont Administrative Procedure Act ("VAPA"), 3 V.S.A. §§ 801-849, the seizure and testing of plaintiff's urine were unlawful, and the punishment imposed for his conviction was a violation of due process.

¶ 6.  The DOC then moved for summary judgment, and plaintiff filed a cross-motion for summary judgment. Following a January 17, 2002 hearing on both motions, the superior court granted the DOC's motion for summary judgment and denied plaintiff's cross-motion. The court found sufficient evidence in the record to support plaintiff's DR conviction and found that the hearing officer's reliance "on the relevant Incident Report, Offender Drug Testing Report, the Chain of Custody Log, and the Request for Drug Analysis" was proper. The court also determined that the DOC had the authority to conduct random drug tests and searches; that the drug test was not unreasonable under the Fourteenth Amendment to the United States Constitution, and was valid under Chapter I, Article 11 of the Vermont Constitution; that the DOC provided specific documentation detailing the chain of custody of the urine sample; and that plaintiff failed to provide any evidence in support of his due process allegations. Plaintiff's appeal to this Court followed.

¶ 7.  Our review of summary judgment is de novo. This Court applies the same standard as the trial court. *Cooper v. Cooper*, 173 Vt. 1, 6, 783 A.2d 430, 435 (2001). We will affirm summary judgment when the record clearly indicates there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Rennie v. State*, 171 Vt. 584, 584-85, 762 A.2d 1272, 1274 (2000) (mem.); V.R.C.P. 56(c). In applying this standard, we regard as true all allegations of the nonmoving party supported by admissible evidence and give the nonmoving party the benefit of all reasonable doubts and inferences. *Politi v. Tyler*, 170 Vt. 428, 431, 751 A.2d 788, 790 (2000). Additionally, when reviewing administrative action by the DOC under V.R.C.P. 75, we will not interfere with the DOC's determinations absent a showing that the DOC clearly and arbitrarily abused its authority. *Vt. State Employees' Ass'n v. Vt. Criminal Justice Training Council*, 167 Vt. 191, 195, 704 A.2d 769, 772 (1997). Finally, when reviewing a decision from an inmate disciplinary hearing, we need find only that there was "some evidence" in order to uphold a conviction. *LaFaso v. Patrissi*, 161 Vt. 46, 49, 633 A.2d 695, 697 (1993). The "some evidence" standard requires us to determine whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. *Herring v. Gorczyk*, 173 Vt. 240, 243, 789 A.2d 955, 958 (2001).

¶ 8.  Plaintiff asserts three arguments on appeal, two of which challenge the procedure used by the DOC in convicting plaintiff of the DR

violation based on his random drug test. First, plaintiff argues that the DOC's failure to provide plaintiff with the actual laboratory reports from his drug test at the disciplinary hearing deprived him of a due process right to present evidence in his favor. Plaintiff, who, at his DR hearing, was given a report stating that he tested positive for THC, claims that the actual laboratory reports would have provided him with exculpatory evidence because the "identification numbers of the tested samples were not the same as those ascribed to [plaintiff's] urine sample." We are unpersuaded.

■ ¶ 9. The actual laboratory reports from plaintiff's drug test were provided to plaintiff in the superior court case. Our review of the laboratory reports indicates that the identification number discrepancy to which plaintiff refers was an insignificant, nonconfusing typographical error that would not seriously call into question the identity of the urine tested.[3] The identity of a specimen used in drug testing need not be proved beyond all possibility of doubt to be admissible. *State v. Ross*, 130 Vt. 235, 240, 290 A.2d 38, 41 (1972). The circumstances need establish only reasonable assurance of the identity of the sample tested. *Id.* The DOC maintained an adequate chain of custody log, and as the superior court concluded, there is no other record evidence indicating a break in the chain of custody. The record evidence provides reasonable assurances that the urine sample which tested positive for THC was the same sample plaintiff provided to a NWCF correctional officer. Therefore, plaintiff did not demonstrate that the DOC's failure to provide him with the actual laboratory reports of his drug test at or before plaintiff's disciplinary hearing resulted in prejudice. See *State v. Mott*, 166 Vt. 188, 193, 692 A.2d 360, 364 (1997) (due process claims are resolved on facts before the Court and individual asserting denial of due process must show prejudice from asserted denial). As noted by the court below:

> Where, as here, provision of the specific laboratory tests, with their positive quantitative results, would further establish the existence of THC in the Plaintiff's system, the Plaintiff cannot show prejudice in the failure to provide them, nor can the Court reach any other conclusion but that the DOC's basis for a conviction would be anything but strengthened.

---

[3] The urine sample taken from plaintiff at the correctional facility was demarcated as "T01-045." The laboratory testing reports that plaintiff sought identified plaintiff's urine sample as "T01-0045." Despite this minor typographical error, there is nothing in the record creating sufficient doubt that the urine sample tested was that given by plaintiff.

Accordingly, plaintiff's alleged denial of due process from the failure to receive the actual laboratory reports of his drug test prior to his disciplinary hearing fails.

¶ 10. Plaintiff also argues that the DOC must establish a threshold level for toxins or other indicators found in an inmate's urine to constitute "use" of illegal drugs, as opposed to second-hand smoke exposure, in order to convict an inmate of a DR violation based on a random drug test. Plaintiff contends that this threshold level is necessary to avoid false positives and the imposition of arbitrary disciplinary sanctions. Again, plaintiff is incorrect.

¶ 11. The DOC, in an effort to implement its zero tolerance policy against illegal drug use in Vermont's prisons, has established a drug testing protocol for inmates that requires testing procedures that have *at least* a "90% . . . reliability rating or any testing process approved by the federal courts for criminal prosecution." Setting appropriate testing standards and procedures is within the expertise of the DOC, and we show great deference to agency administrators in these matters. See *Herring*, 173 Vt. at 248, 789 A.2d at 962; see also *Bell v. Wolfish*, 441 U.S. 520, 548 (1979) (prison administrators have a better grasp of their domain than a reviewing judge; operation of correctional facilities is the province of legislative and executive branches of government). In this case, plaintiff's urine sample was tested on two separate occasions with appropriate testing technology, each time testing positive for the presence of THC in violation of the DOC's zero tolerance policy. The record does not create substantial doubt that plaintiff committed the DR violation for which he was convicted. Thus, plaintiff's second argument fails.

¶ 12. Plaintiff's final argument on appeal is that the DOC did not have the authority to subject him to a random drug test because that drug test occurred under the purview of DOC policy directive 367.01, which plaintiff alleges was not properly promulgated pursuant to Vermont's Administrative Procedure Act. See 3 V.S.A. §§ 831-843 (establishing procedures agency must follow in issuing rules, including publication, notice and comment, hearings and legislative review). According to plaintiff, the DOC's reliance on policy directive 367.01 renders his drug test, and consequently, his DR conviction based on that drug test, unlawful.[4]

---

[4] The State attempts to rebut this claim by citing newly enacted provisions of VAPA not in existence at the time of plaintiff's drug test. The State contends that these recently enacted statutory provisions have retroactive effect, but offers no support for this suggestion. As such, this Court does not find the State's response to plaintiff's claim helpful.

¶ 13. To support his final claim, plaintiff relies on this Court's decision in *Parker v. Gorczyk*, 173 Vt. 477, 787 A.2d 494 (2001) (mem.). *Parker* involved a challenge by a class of prisoners to an amendment of the DOC's furlough policy making inmates convicted of violent felonies ineligible for furlough until the expiration of their minimum sentences. *Id.* at 477, 787 A.2d at 495-96. The prisoners claimed that the amendment was invalid because it was not adopted pursuant to VAPA. *Id.* We determined that the Legislature did not exempt the DOC from compliance with the rulemaking procedures of VAPA and that "if the Commissioner adopts rules he must do so by following the statutory rulemaking procedures [of VAPA]." *Id.* at 478, 787 A.2d at 497. The operative question then became whether the amendment to the DOC's furlough policy constituted a "rule." We held that the amendment met the VAPA definition of a "rule" because it implemented a written change in agency policy and was generally applicable to all prisoners convicted of violent felonies. *Id.* at 479, 787 A.2d at 497-98. The amendment to the DOC's furlough policy was, therefore, invalid for noncompliance with VAPA. *Id.*

¶ 14. Plaintiff asserts that policy directive 367.01 is a rule requiring adoption in accordance with the requirements of VAPA. In policy directive 367.01, the DOC has, pursuant to its statutory authority in Title 28 of the Vermont Statutes, implemented procedures for, inter alia, the random drug testing of ten percent of the inmate population in state correctional facilities each week. The superior court did not specifically address plaintiff's assertion that policy directive 367.01 is a rule requiring adoption, but instead found that the drug test occurred pursuant to "valid, clear and objective guidelines," and that "the DOC's random seizure and subsequent search of the Plaintiff's urine was lawful under both Federal and Vermont constitutional standards even if 367.01 was not duly adopted." We agree with the trial court's result, but given our decision in *Parker*, find it necessary to determine whether the portions of policy directive 367.01 governing the process for conducting random inmate drug testing in state correctional facilities qualify as a "rule" requiring promulgation pursuant to VAPA.

¶ 15. In cases challenging the validity of an administrative agency's policy based on a failure to promulgate that policy pursuant to VAPA, a court must determine whether the challenged policy is a "rule" subject to the rulemaking procedures of VAPA or whether that policy is exempt from those procedures. See *Parker*, 173 Vt. at 478-79, 787 A.2d at 497. In *Parker*, we rejected the DOC's argument that the contested furlough policy constituted a "practice" exempt from the rulemaking provisions of VAPA. *Id.* at 479, 787 A.2d at 498. We noted that, while the furlough

policy may have also been a practice, some policies constituting an agency practice may also qualify as a rule requiring promulgation pursuant to VAPA. *Id.*

¶ 16. VAPA includes distinct provisions defining both a rule and a practice. A "practice" is defined as "a substantive or procedural requirement of an agency, affecting one or more persons who are not employees of the agency, which is used by the agency in the discharge of its powers and duties. The term includes all such requirements, regardless of whether they are stated in writing." 3 V.S.A. § 801(b)(7). A "rule," on the other hand, refers to:

> each agency statement of general applicability which implements, interprets, or prescribes law or policy; or a *practice* which has been adopted in the manner provided by sections 836-846 of this title, either as the result of a requirement of law or as the result of a request under section 831(c) of this title.

*Id.* § 801(b)(9) (emphasis added). "[W]here due process or a statute directs an agency to adopt rules," those rules must be adopted according to VAPA's rulemaking procedures set forth in §§ 836-844. *Id.* § 831(a). A practice, however, is exempt from those rulemaking procedures unless an interested person requests an agency to "adopt a procedure describing an existing practice." *Id.* § 831(b). An agency is also required to "initiate rulemaking to adopt as a rule an existing practice or procedure when so requested by 25 or more persons or by the legislative committee on administrative rules." *Id.* § 831(c). However, the DOC is exempt from the rulemaking requirements of § 831(c) when existing practices concern "only inmates of a correctional or detention facility." *Id.* § 832(b)(4).

¶ 17. The Legislature, through the statutory language and structure of VAPA, distinguishes between a rule and a practice, and exempts some agency practices from rulemaking. See *In re Picket Fence Preview*, 173 Vt. 369, 371, 795 A.2d 1242, 1244 (2002) (to determine legislative intent, Court first looks to the language of the statute itself); see also *In re S. Burlington-Shelburne Highway Project*, 174 Vt. 604, 605, 606, 817 A.2d 49, 51, 52 (2002) (mem.) (Court presumes the Legislature intended the plain, ordinary meaning of the adopted statutory language and that this language was inserted advisedly without the intent to create surplusage). In our view, the aspects of policy directive 367.01 governing the process for conducting random inmate drug testing in state correctional facilities qualify as a practice exempt from the rulemaking procedures of VAPA. In policy directive 367.01, the DOC has established a

written "procedural requirement . . . used by the agency in the discharge of its powers and duties." 3 V.S.A. § 801(b)(7).

¶ 18. The Legislature has conferred upon the DOC statutory authority to "establish, maintain and administer such state correctional facilities and programs as may be required for the custody, control, correctional treatment and rehabilitation of committed persons, and for the safekeeping of such other persons as may be committed to the department in accordance with law." 28 V.S.A. § 101(1). The DOC commissioner is charged with the responsibility of "prescrib[ing] rules and regulations for the maintenance of discipline and control at each correctional facility," *id.* § 102(c)(5), and "maintain[ing] security, safety and order at the correctional facilities." *Id.* § 102(c)(6). Guarding against drugs and other contraband, thwarting escape, and maintaining a sanitary and heathy prison environment for both prisoners and correctional officers necessitates the use of random prisoner searches. *State v. Berard,* 154 Vt. 306, 312, 576 A.2d 118, 121-22 (1990) (adopting conclusions of majority in *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984), that the volatile prison environment justifies random searches of prisoners' cells); see also *Bell,* 441 U.S. at 558 (holding that strip and body cavity searches of prisoners did not violate the Fourth Amendment because of unique prison setting). Random drug tests, "because of the uncertainty they involve, are one of the most effective weapons against the increasing presence of drugs . . . in our prisons." *Berard,* 154 Vt. at 317, 576 A.2d at 124. Without an effective procedure for detecting contraband, the DOC could not fulfill its "primary objective [of] the disciplined preparation of offenders for their responsible roles in the open community." 28 V.S.A. § 1(b); see also *id.* § 101(1) (outlining department's powers and duties); *Berard,* 154 Vt. at 313, 576 A.2d at 122.

¶ 19. Given this statutory mandate, the DOC has the authority to administer constitutionally permissible random drug tests to its inmates. See *Daye v. State,* 171 Vt. 475, 478, 769 A.2d 630, 633 (2000) (administrative agency has " 'only such powers as are expressly conferred upon it by the Legislature, together with such incidental powers expressly granted or necessarily implied as are necessary to the full exercise of those granted.' " (quoting *Trybulski v. Bellows Falls Hydro-Elec. Corp.,* 112 Vt. 1, 7, 20 A.2d 117, 120 (1941))). Prisoners in the care and custody of the DOC have an "expectation of privacy [that is] considerably diminished at best," *Berard,* 154 Vt. at 311, 576 A.2d at 121, and can and should expect to be subjected to constitutionally permissible procedures for the detection of contraband. See *Spence v. Farrier,* 807 F.2d 753, 755 (8th Cir. 1986) (prisoner's diminished privacy interest justified random,

warrantless urinalysis testing). The DOC does not, however, have the unfettered right to invade even the diminished privacy interests of inmates committed to the state's correctional facilities. *Berard*, 154 Vt. at 317, 576 A.2d at 124. Procedural guidelines are necessary to protect the constitutional rights of inmates when the DOC acts upon its statutory authority to maintain safety, security, and discipline; that is, when the agency is discharging its powers and duties.

¶ 20.   However, the need for procedural guidelines does not equate to a need for rulemaking. Recently, this Court held that an agency is not required to adopt rules or regulations to carry out what its authorizing statute specifically directs it to do. *State v. Wuerslin*, 174 Vt. 570, 571, 816 A.2d 445, 446-47 (2002) (mem.) (promulgation of rules pursuant to VAPA not required by Department of Liquor Control where agency expressly authorized to enforce state's liquor laws). In *Wuerslin*, we rejected the defendant's assertion that the Department of Liquor Control must promulgate detailed regulations governing sting operations in order to avoid abuse of discretion by department agents, in part because the undercover sting operations utilized by the department did not implicate Fourth Amendment rights. *Id.* at 572, 816 A.2d at 448. Further, we stated that "assuming for argument that there was a Fourth Amendment right at stake, rule making under VAPA would not be the remedy." *Id.* That conclusion was based on our decision in *State v. Record*, 150 Vt. 84, 584 A.2d 422 (1988), a case which involved a challenge to the constitutionality of DUI roadblocks. In *Record*, we held that DUI roadblocks are constitutionally permissible when the police conduct those roadblocks pursuant to detailed guidelines designed to ensure stops that are not unduly intrusive and do not arbitrarily single out drivers. *Id.* at 86, 584 A.2d at 424-26. We did not, however, require police to engage in formal rulemaking when implementing these guidelines.

■ ¶ 21.   Unlike the undercover sting operation at issue in *Wuerslin*, Fourth Amendment rights are implicated in this case, just as they were in *Record*. Accordingly, drug tests administered by the DOC must adhere to the procedural safeguards we require for random, warrantless searches in a prison setting. Those safeguards are: (1) the establishment of clear, objective guidelines by a high-level administrative official; (2) the requirement that those guidelines be followed by implementing officials; and (3) no systematic singling out of inmates in the absence of probable cause or articulable suspicion.[5] *Berard*, 154 Vt. at 314, 576 A.2d at 122.

---

[5] In his brief, plaintiff suggests that the random drug test he was subjected to by the DOC violated his state and federal constitutional rights. Plaintiff did not adequately brief this claim

¶ 22. In this case, the portions of policy directive 367.01 challenged by plaintiff outline the process for conducting random drug testing in DOC facilities. In addition to establishing the procedure for randomly selecting inmates for testing, the challenged portions of policy directive 367.01 include a seven-step "Drug Testing Procedure," a two-step process for "Storage and Transfer" of urine samples, a three-step procedure for "Urine Specimen Testing," and a procedure to follow after receipt of either a negative or positive test result.[6] Our review of the directive indicates that the commissioner has established the "clear, objective guidelines" that this Court found necessary for constitutionally adequate random inmate searches in *Berard*, 154 Vt. at 314, 576 A.2d at 122, and memorialized those guidelines in the procedural requirements of policy directive 367.01, to ensure that the agency and its officials discharge their powers and duties in an appropriate manner. The DOC's establishment of procedural requirements for conducting those tests has, in effect, created an agency manual or reference guide for DOC officers in carrying out the practice of constitutionally permissible random inmate drug testing. And while establishment of those clear guidelines is necessary to protect Fourth Amendment rights, this requirement does not, in turn, necessitate promulgation of those guidelines pursuant to VAPA. See 3 V.S.A. §§ 801(b)(7), 831(a)-(b) (procedural requirements of agency used to discharge powers and duties qualify as practice exempt from rulemaking); *Record*, 150 Vt. at 90, 584 A.2d at 426 (holding that police must conduct DUI roadblocks in accordance with written procedural guidelines, but not requiring police to engage in formal rulemaking). "Agency protocols and procedures, like agency manuals, do not have the force or effect of a statute or an administrative regulation. Rather, they provide officials with guidance on how they should perform those duties which are mandated by statute or regulation." *Wanzer v. Dist. of Columbia*, 580 A.2d 127, 133 (D.C. Ct. App. 1990). Moreover, as we noted in *Wuerslin*, a department's use of an investigative technique does not qualify as a rule of general applicability simply because the department utilizes that technique frequently, as the DOC must in order to conduct constitutionally permissible random inmate drug testing. 174 Vt. at 571, 816 A.2d at 447. "[F]requency of use does not make a practice a rule." *Id.*

¶ 23. The distinction between a rule requiring promulgation pursuant to VAPA and a practice exempt from the statute's provisions is less than

---

and, therefore, we will not address it further. *State Farm Mut. Auto Ins. Co. v. Powers*, 169 Vt. 230, 242, 732 A.2d 730, 738 (1999) (Court will not decide issues inadequately briefed); see also V.R.A.P. 28(a)(4) (setting forth requirements for adequate briefing).

[6] The relevant portions of policy directive 367.01 are produced in full at Appendix A.

precise, but the Legislature's adopted language demonstrates a specific legislative intent to create a rule/practice dichotomy.[7] See *Payea v. Howard Bank*, 164 Vt. 106, 107, 663 A.2d 937, 938 (1995) (Court presumes legislative language is inserted advisedly). Other jurisdictions, while not expressly adopting this dichotomy, do exempt certain agency policies and procedures from administrative rulemaking requirements. For example, the federal act exempts "interpretive rules" from rulemaking procedures, see 5 U.S.C. § 553(b)(3)(A), and many state courts have held that specific provisions of their administrative procedure acts exempt, inter alia, interagency directives, interpretive statements, and guidelines. See *Kent County Aeronautics Bd. v. Dep't of State Police*, 609 N.W.2d 593, 603-04 (Mich. Ct. App. 2000) (holding that under Michigan's administrative procedure act, which exempts directives and guidelines that do not alter or affect existing rights, police department's "equivalent site criteria" for construction of communications tower was exempt from rulemaking); *Downeast Energy Corp. v. Fund Ins. Review Bd.*, 756 A.2d 948, 953-54 (Me. 2000) (holding that under Maine's statute, which exempts agency guidance or instructions intended to advise persons in determining their legal rights and duties, agency guidelines for cleanup of hydrocarbon spill were exempt from rulemaking requirements); *N.J. Builders Ass'n v. N.J. Dep't of Envtl. Protection*, 703 A.2d 323, 326-28 (N.J. Super. Ct. App. Div. 1997) (department order providing guidance to department staff on applying departmental policies and regulations was exempt from

---

[7] The Legislature's intent to distinguish between a "rule" and a "practice" exempt from rulemaking is further supported by VAPA's departure from the Uniform Law Commissioners' Model State Administrative Procedure Act, the Federal Administrative Procedure Act, see 5 U.S.C. § 551(4), and administrative procedure acts adopted by a majority of the states. Unlike VAPA, these acts include the term "practice" or "practice requirements" within their statutory definition of "rule" or "regulation" and, while exempting certain types of agency action from the definition of "rule," do not provide a separate definition of "practice." See Ala. Code § 41-22-3(9) (2002); Ariz. Rev. Stat. § 41-1001(17) (2003); Ark. Code Ann. § 25-15-202(8) (2002); Colo. Rev. Stat. § 24-4-102(15) (2003); Conn. Gen. Stat. § 4-166(13) (2003); Fla. Stat. ch. 120.52(15) (2003); Ga. Code Ann. § 50-13-2(6) (2003); Haw. Rev. Stat. § 91-1(4) (2002); Idaho Code § 67-5201(19) (2002); Ind. Code § 4-21.5-1-14 (2003); Iowa Code § 17A.2(11) (2003); Ky. Rev. Stat. Ann. § 13A.010(2) (2003); La. Rev. Stat. Ann. § 49:951(6) (2003); Me. Rev. Stat. Ann. tit. 5, § 8002(9) (2002); Md. Code Ann., State Gov't § 10-101(g) (2002); Mich. Comp. Laws § 24.207 (2003); Mo Rev. Stat. § 536.010(4) (2002); Mont. Code Ann. § 2-4-102(11) (2001); Nev. Rev. Stat. 233B.038(1) (2003); N.H. Rev. Stat. Ann. § 541-A:1(XV) (2002); N.J. Stat. Ann. § 52:14B-2(e) (2003); N.M. Stat. Ann. § 12-8-2(G) (2002); N.Y. A.P A. Law § 102(2) (2003); N.C. Gen. Stat. § 150B-2(8a) (2002); N.D. Cent. Code § 28-32-01 (2001); Okla. Stat. tit. 75 § 250.3(15) (2002); Or. Rev. Stat. § 183.310(8) (2001); 71 Pa. Cons. Stat. Ann. § 745.3 (2003); R.I. Gen. Laws § 42-35-1(h) (2002); S.C. Code Ann. § 1-23-10(4) (2002); S.D. Codified Laws § 1-26-1(8) (2002); Tenn. Code Ann. § 4-5-102(10) (2003); Tex. Gov't Code Ann. § 2001.003(6) (2003); Wyo. Stat. Ann. § 16-3-101(b)(ix) (2002).

rulemaking under the state's administrative procedure act excluding statements concerning internal management and discipline and interagency statements from definition of a "rule"); *Rossie v. State/Dep't of Revenue*, 395 N.W.2d 801, 804-05 (Wis. Ct. App. 1986) (department directives prohibiting smoking in department facilities exempt from rulemaking under Wisconsin's administrative procedure act, which exempts agency action concerning internal management). Courts have recognized that there is no bright line between exempt procedures and those rules requiring adoption pursuant to rulemaking requirements. See *Warder v. Shalala*, 149 F.3d 73, 79 (1st Cir. 1998) ("The line between a legislative or substantive rule and an interpretive one [exempt from rulemaking] is, as many courts have noted, far from clear."); see also *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980) ("Particular [agency] actions combine the qualities of interpretative rules, polices, internal procedures, and legislative rules."). Therefore, in an effort to provide some clarity to the legislative intent of these acts, courts have looked beyond labels—statutory or otherwise—and examined the purpose and effect of agency procedures to determine their status. See *Warder*, 149 F.3d at 80 ("Where a rule falls along the interpretative/legislative spectrum will turn in many cases on the novelty of a rule's substantive content."); *Sweetman v. State Elections Enforcement Comm'n*, 732 A.2d 144, 159 (Conn. 1999) ("The criteria that determine whether administrative action is a 'regulation' are neither linguistic nor formalistic. . . . The test is, rather, whether a rule has a substantial impact on the rights and obligations of parties . . . .") (internal quotation omitted).

¶ 24. Many of these courts have applied a persuasive approach: agency procedures that do not alter or affect substantive legal rights do not qualify as rules requiring adoption pursuant to statutory requirements. See *Sweetman*, 732 A.2d at 159; *United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1168 (9th Cir. 2000) (for rule to be subject to rulemaking requirements, it "must be legislative in nature, affecting individual rights and obligations") (internal quotation omitted); *Warder*, 149 F.3d at 80 (rule substantive if it "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself"; rule exempt from rulemaking requirements if it does not effect a substantive change) (internal quotation omitted); *Kent*, 609 N.W.2d at 604 (agency guidelines akin to instructions exempt from rulemaking procedures because they did not create any legal obligation, nor did they "enlarge, abridge, or in any way affect the rights of the public"). Admittedly, many state courts have followed this approach because their administrative procedure acts specifically exempt certain practices that do

not affect substantive legal rights. See, e.g., *id.* at 603 (statute exempts from rulemaking interagency directives that do "not affect the rights of, or procedures and practices available to, the public"). Federal courts, however, apply this approach to distinguish between "substantive" rules, which are subject to rulemaking, and "interpretive" rules, which are exempt, because the federal act does not define those terms. See 5 U.S.C. § 551; *Warder*, 149 F.3d at 79 (examining a rule's effect on substantive rights because federal act does not define "substantive" or "interpretive"). We conclude, given the broad definition of "practice" in 3 V.S.A. § 801(b)(7), and the omission of language specifically limiting certain exempt practices to those which do not affect substantive legal rights, that the Legislature, in creating a rule/practice dichotomy, at least intended to exempt from VAPA practices "used by the agency in the discharge of its powers and duties," *id.* § 801(b)(7), that do not alter or affect substantive legal rights.[8] As such, this approach is instructive in determining whether the provisions of policy directive 367.01 challenged by plaintiff are exempt from VAPA's rulemaking requirements.[9]

¶ 25. In drafting procedural guidelines for random inmate drug testing, the DOC has not crafted a rule comprising an "agency statement of general applicability which implements, interprets, or prescribes law or policy." *Id.* § 801(b)(9). Instead, these guidelines establish the process correctional officers must follow when conducting random drug testing– from the way in which inmates are chosen, to the way in which urine samples are collected. "An internal agency 'practice or procedure' is primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Batterton*, 648 F.2d at 702 n.34; see also *W. Radio Servs.*

---

[8] As it is unnecessary for the resolution of this appeal, we express no opinion as to whether the Legislature intended to exempt certain agency practices that alter or affect substantive legal rights.

[9] To avoid any confusion, we note that courts need not apply this approach to all claims of improper or required promulgation of agency conduct as a "rule" pursuant to VAPA. As we have indicated in the past, the reach of VAPA is limited: VAPA requires an agency to promulgate rules only "[w]here due process or a statute directs an agency to adopt rules." 3 V.S.A. § 831(a). Moreover, adjudicative decisions made by an agency within the context of a contested case are not subject to the rulemaking procedures of VAPA. See *Parker*, 173 Vt. at 480, 787 A.2d at 498 ("Nothing in this decision impinges on the Commissioner's day-to-day decision-making authority . . . ."); *In re Telesystems, Corp.*, 143 Vt. 504, 511, 469 A.2d 1169, 1172-73 (1983) (adjudicative decision made within context of contested case falling within agency jurisdiction did not constitute rulemaking). To the extent that agencies promulgate "new polices of general applicability, they are subject to the rulemaking procedure. [V]APA goes no further." *Parker*, 173 Vt. at 480, 787 A.2d at 498 (emphasis added).

*Co. v. Espy,* 79 F.3d 896, 901 (9th Cir. 1996) (agency manual and handbook establishing guidelines for exercise of Forest Services's prosecutorial discretion exempt from rulemaking requirements because manual did not affect individual rights and obligations); *Kent,* 609 N.W.2d at 604 (state police department's "equivalent site criteria" for construction of communications tower analogous to set of instructions for proposing alternative site and did not alter or affect existing rights). Here, while implementing the department's statutory mandate to maintain discipline, the DOC's establishment of procedural guidelines in policy directive 367.01 protects and does not alter or affect the guaranteed constitutional rights of agency inmates during random drug testing. Given the diminished privacy rights of inmates in DOC facilities, these procedural guidelines simply ensure testing that is neither unduly intrusive, nor arbitrarily applied. See *Record,* 150 Vt. at 88, 548 A.2d at 425. Therefore, the challenged portions of policy directive 367.01 did not affect or alter the individual rights and obligations of plaintiff when followed by the correctional officers conducting plaintiff's drug test.[10]

¶ 26. In contrast, the DOC's amended furlough policy at issue in *Parker* represented a generally applicable change in existing agency policy affecting or altering the legal rights of its prisoners, and thus met the statutory definition of a rule requiring proper promulgation. 173 Vt. at 479, 787 A.2d at 497-98; see also *In re Diel,* 158 Vt. 549, 554-55, 614 A.2d 1223, 1227 (1992) (agency adoption and subsequent rescission of policy change affecting calculation of welfare benefits invalid for failure to promulgate pursuant to VAPA). As a result, the testing procedures plaintiff contests are markedly different from the amended furlough policy this Court invalidated in *Parker.*

¶ 27. Consequently, the provisions of policy directive 367.01 governing the process for random inmate drug testing in state correctional facilities qualify as a "practice" under 3 V.S.A. § 801(b)(7), and not as a "rule" requiring promulgation pursuant to the rulemaking procedures of VAPA. Therefore, plaintiff's random drug test was not illegal for noncompliance with VAPA. Moreover, apart from plaintiff's first two claims on appeal, plaintiff does not suggest that the DOC failed to follow its established guidelines when conducting the drug test. Neither plaintiff nor the record evidence indicates any pattern of arbitrary conduct or particularized

---

[10] An inmate who tests positive following administration of the drug testing procedures in policy directive 367.01 will be subject to disciplinary action pursuant to DOC directive 410.01. Plaintiff did not challenge the validity of directive 410.01 below, and, therefore, its incorporation into policy directive 367.01 does not affect our conclusion that policy directive 367.01 did not alter or affect plaintiff's substantive legal rights.

unfairness present in the administration of plaintiff's random drug test. See *Berard*, 154 Vt. at 314, 576 A.2d at 122 (prohibiting "systematic singling out of inmates" in carrying out random searches of prisoners' cells); see also *Spence*, 807 F.2d at 755 (when state employs random drug tests utilizing urinalysis, the procedures for selecting inmates must be truly random to avoid violation of Fourth Amendment). Accordingly, plaintiff's final claim on appeal fails.

¶ 28. We hold that the provisions of policy directive 367.01 governing the process for random inmate drug testing in state correctional facilities do not qualify as a "rule" requiring adoption pursuant to VAPA, but instead outline the agency's practice for conducting constitutionally permissible random inmate drug testing. Additionally, the drug testing and disciplinary hearing procedures utilized by the DOC did not violate constitutional safeguards afforded to plaintiff. For these reasons, we uphold the superior court's grant of summary judgment in favor of the DOC. Plaintiff presents no genuine issues of material fact, and the DOC is entitled to judgment as a matter of law. Plaintiff's DR conviction is supported by at least "some evidence" in the record and, therefore, must be upheld. See *Herring*, 173 Vt. at 243, 789 A.2d at 958.

*Affirmed.*

## APPENDIX A

### Department of Corrections Policy Directive 367.01

IV.     Directive

A.      Drug Testing Procedure

1.      All testing of offenders for drugs by the Vermont Department of Corrections shall be conducted as follows:

2.      The offender shall be brought to a location designated by the Superintendent in local procedure, where a urine sample can be discreetly collected. The room where the specimen is to be collected will be searched prior to placing the offender inside. Offenders under community supervision will be pat searched and incarcerated persons strip searched, prior to collection of the specimen.

3.      A container, labeled with the offender's name, provided by the urine testing entity will be given to the offender for collection of the specimen. The offender will always be observed while providing a urine sample in such a manner as to assure the purity of the sample.

4. The offender will be required to provide an amount of urine sufficient for testing in order to avoid disciplinary sanctions and/or program sanctions. An insufficient amount shall be considered refusal to provide a specimen.

5. The specimen will be given by the offender to an officer. The officer will remove an amount sufficient for performing a preliminary screening test. If the preliminary screening test is positive, the specimen will be immediately sealed for further testing. If the preliminary screening test is negative, the process will end.

6. Offenders who cannot urinate will be placed in a dry room and given 8 ounces of water to drink. They may stay there up to two hours. Failure to provide a urine specimen in that period of time will constitute refusal and a disciplinary report may be issued.

7. If an offender tests positive for drugs on the field screening test and when confronted with the test result admits to drug usage, further testing is not required. The offender's admission is sufficient evidence for discipline or graduated sanctions. If there is no admission, then a confirmation test must be done.

8. Storage and Transfer

a. When practical, within 24 hours, the sealed specimen will be placed in the mail in the appropriate mailing container, or will be delivered to the testing laboratory. A chain of custody log will always be maintained. The chain of custody log will contain the name of each person handling the sample and the date and time.

b. If the specimen cannot be immediately mailed or delivered to the testing laboratory, it will be stored in a secure location, refrigerated. The chain of custody log will be maintained until a negative test result is received or the disciplinary appeal process has been exhausted.

9. Urine Specimen Testing

a. Testing laboratories will conduct two tests. A screening test will be conducted and then a confirming test. Test results will be provided in writing.

b. Testing laboratories will utilize technologies having a 90% (ninety per cent) reliability rating or any testing process approved by the federal courts for criminal prosecution.

c. To be considered a separate positive test result, indicative of continued or repeated drug usage, the following time frames must have elapsed between specimen collections:

| DRUG COLLECTIONS | DURATION OF DETECTIBILITY | BETWEEN | TIME ELAPSED SPECIMEN |
|---|---|---|---|
| Amphetamines | 48 Hours | | 48 Hours |
| Benzodiazepines | 3 Days | | 3 Days |
| Cannabinoids | 30 Days | | 30 Days |
| Cocaine Metabolites | 4 Days | | 4 Days |
| Ethanol | 24 Hours | | 24 Hours |
| Methadone | 4 Days | | 4 Days |
| Opiates | 48 Hours | | 48 Hours |
| Phencyclidine (PCP) | 9 Days | | 9 Days |
| Propoxyphene | 48 Hours | | 48 Hours |

. . . .

C.  Testing in Central Facilities

1.  *Random Testing in Central Facilities*

a.  Once each week ten per cent (10%) of the population of each central facility will be randomly tested. A lottery system will be used to select those inmates who are to be tested. Lotteries will be computer generated at Central Office.

b.  The testing procedure utilized is in accordance with the procedure described in this directive.

c.  If a negative result is returned from the laboratory, this will conclude the process. If the test is positive, disciplinary action will be taken in accordance with Vermont Department of Corrections Directive #410.01, "Discipline".

d.  A positive result may require the inmate to enter a drug treatment program.

e.  A file will be maintained for each weekly random testing episode that will include the following at a minimum:

1.  the headcount for that day;

2.  list of all inmates tested;

3.  type of test administered (i.e., ONTRAK stick);

4.  results of each test per inmate;

5.  time and location of each test;

6.  short narrative of results and needed follow-up.