2008 VT 92

## In re HARTLAND GROUP NORTH AVENUE PERMIT

[958 A.2d 685]

No. 07-434

¶ 1. July 1, 2008. Neighboring landowners appeal the Environmental Court's approval of an adaptive reuse project involving an existing industrial warehouse located in a medium-density residential district in Burlington. Landowners assert that the Environmental Court erred in finding that a final decision on the project's Act 250 permit precluded additional consideration of whether the project was in substantial conformance with Burlington's municipal plan. They also assert that the court erred in finding that the project complied with the zoning ordinance's requirements for adaptive reuse, parking, and design review and that a 2004 amendment to the maximum density provision in the zoning ordinance was not spot zoning. We affirm.

¶ 2. The underlying facts are as follows. In 2004, appellee, the Hartland Group, met with members of Burlington's Department of Planning and Zoning to discuss the existing language of the maximum-density exceptions in the city's zoning ordinance. At that time, § 5.2.6(b)(2) — pertaining to exceptions for adaptive reuse — allowed a density of up to forty units per acre for adaptive-

reuse or residential-conversion projects provided that lot coverage did not exceed 80% and the number of ancillary newly constructed units did not exceed 175% of the units contained in the original structure. The Department agreed with Hartland that the existing provision had the potential to cause confusion and suggested that amending the ordinance was appropriate. On May 28, 2004, after a full review process by the planning commission and city council, the mayor signed an amendment that removed the 175% limitation on the allowable number of new units.

¶ 3. On February 4, 2005, Hartland applied to the Burlington Development Review Board (DRB) for a zoning permit for the adaptive reuse or residential conversion of an existing 16,500 square-foot industrial warehouse located on 0.65 acres at 237 North Avenue. The warehouse is in a medium-density residential district and, at the time of the proposal, was permitted to operate as a nonconforming use (i.e., industrial) in that district. Hartland proposed converting the structure into twenty-five units of mixed-income residential condominiums, thirty enclosed parking spaces,[1] and a forty-seat café on North Avenue, intended to serve the neighborhood.[2] On June 10, 2005, the DRB issued its affirmative and conditional findings and granted the zoning permit to Hartland.

¶ 4. Appellants, a group of neighboring landowners, appealed the DRB's decision to the Environmental Court on June 24, 2005. Landowners submitted ten questions on appeal, specifically: (1) whether the proposed development complied with the city's municipal plan; (2) whether the proposed development was adaptive reuse under the city's zoning ordinance; (3) whether the proposed development complied with the zoning ordinance's setback requirements; (4) whether the proposed development complied with the zoning ordinance's parking requirements; (5) whether the proposed development complied with the zoning ordinance's design-review criteria; (6) whether the proposed development complied with the zoning ordinance's major-impact-review criteria; (7) whether the proposed development complied with the zoning ordinance's use requirements; (8) whether the proposed development complied with the zoning ordinance's nonconforming-use requirements; (9) whether the proposed development complied with the zoning ordinance's requirements for building dimensions; and (10) whether the 2004 amendment to the zoning ordinance was spot zoning. In response, the parties filed motions and cross-motions for summary judgment on questions 2, 3, 4, 8, 9 and 10. In the meantime, the District #4 Environmental Commission (DEC) granted the project an Act 250 permit, which the parties did not appeal. On December 14, 2006, the Environmental Court granted summary judgment in favor of Hartland on questions 2, 3, part of 8 (finding that the prior nonconforming use was not abandoned), and 10. The court also determined that question 1 was precluded by the DEC's decision on the Act 250 permit but reserved the remaining questions for trial.

¶ 5. A trial on the merits was held on March 15 and 30, 2007. On the first day of

---

[1] Hartland originally argued that the project would have thirty-nine enclosed parking spaces by including nine "tandem" spaces in its calculation. "Tandem" spaces are long spaces designed to accommodate an additional car in tandem. The Environmental Court determined in its December 14, 2006 summary judgment decision that § 10.1.16 of the zoning ordinance precludes the tandem spaces from being counted towards compliance.

[2] The proposed project would be approximately 51,000 square feet, including a 12,500-square-foot indoor parking garage.

trial, the court entered judgment for Hartland on question 9 based on the record. Thereafter, on August 31, 2007, the court issued its decision in favor of Hartland on all remaining questions — specifically, questions 4, 5, 6 and part of 8 (the remaining question of whether the café use would be less harmful to the neighborhood than the industrial-warehouse use, as required by §§ 20.1.6 and 5.1.8 of the zoning ordinance) — and approved the project as proposed, subject to the DRB conditions and additional conditions recommended by the court. On September 24, 2007, after both parties agreed, the court entered a judgment order in which it adopted its proposed conditions.

¶ 6. On appeal, landowners claim that the Environmental Court erred in five of its rulings. They assert that: (1) the DEC decision on the Act 250 permit should not have preclusive effect on the present zoning appeal; (2) the project cannot qualify as adaptive reuse under the zoning ordinance; (3) the project does not comply with the parking provisions of the zoning ordinance; (4) the project does not comply with the design-review provisions of the zoning ordinance; and (5) the 2004 amendment relating to adaptive reuse is unconstitutional spot zoning.

¶ 7. Landowners' first argument — that the DEC's decision on the project's conformance with the municipal plan under Act 250 should not preclude a similar analysis under the zoning ordinance — is unavailing. Collateral estoppel, or issue preclusion, is appropriate when: "(1) preclusion is asserted against one who was a party in the prior action; (2) the same issue was raised in the prior action; (3) the issue was resolved by a final judgment on the merits; (4) there was a full and fair opportunity to litigate the issue in the prior action; and (5) applying preclusion is fair." *Trickett v. Ochs*, 2003 VT 91, ¶ 10, 176 Vt. 89, 838 A.2d 66. The Environmental Court, in its ruling on the parties'

summary judgment motions, found that all of the prerequisites for preclusion were satisfied on the issue of the project's conformance with the municipal development plan. On appeal, landowners contest only the Environmental Court's finding that the requirements for conformance with the city's municipal plan under Act 250 and the zoning ordinance present the same issue. They argue that preclusion is improper because Act 250 and municipal zoning review are two separate processes with distinct criteria.

¶ 8. Under criterion 10 of Act 250, a project must be in "*conformance* with any duly adopted local or regional plan" to qualify for a development permit. 10 V.S.A. § 6086(a)(10) (emphasis added). Similarly, § 13.1.6(j) of the Burlington Zoning Ordinance requires a project to be "in *substantial conformance* with the city's municipal development plan" before a municipal permit will be issued. Burlington Zoning Ordinance § 13.1.6(j) (emphasis added). As noted by the Environmental Court, administrative decisions can have preclusive effect in judicial proceedings when the administrative body has acted in a judicial capacity, resolving disputed issues of fact, and providing the parties with an adequate opportunity to litigate. *Trickett*, 2003 VT 91, ¶ 11. While the standards for permit approval under Act 250 and the zoning ordinance differ in significant respects, there is overlap between the two with respect to the requirement of conformance with the municipal plan. Here, the DEC acted in a judicial capacity, providing both landowners and Hartland the opportunity to present evidence on the issue of conformance with the municipal development plan, and ultimately issued the Act 250 permit, deciding based on the evidence before it that the project was "in conformance with" the local plan. The Act 250 requirement that a project be "in conformance with" the city's municipal plan, without any qualifiers, is arguably a

stricter standard than the zoning ordinance's requirement of "substantial conformance" with the plan. Thus, it was reasonable for the Environmental Court to conclude that the DEC's finding that the project was in specific "conformance with" the municipal development plan precluded the parties from relitigating the issue under the zoning ordinance because, as a practical matter, the project could not at the same time be "in conformance with" the municipal plan and not in "substantial conformance with" it. The court's construction of the language of § 13.1.6(j) of the ordinance was not "clearly erroneous, arbitrary, or capricious," and we therefore uphold its decision. *In re Bennington Sch., Inc.*, 2004 VT 6, ¶ 11, 176 Vt. 584, 845 A.2d 332 (mem.).

¶ 9. Landowners' second argument — that the Environmental Court erred in finding that the proposed project met the requirements for the adaptive-reuse exception to maximum density — is similarly unconvincing. Section 5.2.6(b)(2) of the zoning ordinance provides that:

> Residential development in [medium-density residential] districts at a density of forty (40) units per acre may be permitted for the adaptive reuse or residential conversion of existing nonresidential structures and for any new construction on the same lot ancillary to the rehabilitation of such nonresidential structures provided lot coverage does not exceed eighty (80) percent.

Burlington Zoning Ordinance § 5.2.6(b)(2).

¶ 10. Landowners do not contend that Hartland's project exceeds the forty units per acre or 80% lot-coverage allowances; rather, they claim that the density requirement is not satisfied because the project incorporates the commercial, nonconforming café use and that, therefore, it cannot be considered adaptive reuse or

residential conversion as required by the ordinance. While the term "adaptive reuse" is not defined in the zoning ordinance, the court found that when viewed in the context of the municipal plan the term was not ambiguous as used in § 5.2.6(b)(2). See *Kalakowski v. John A. Russell Corp.*, 137 Vt. 219, 225-26, 401 A.2d 906, 910 (1979) ("Although the plan may recommend many desirable approaches to municipal development, only those provisions incorporated in the by-laws are legally enforceable."). In the context of the municipal plan that the Burlington Zoning Ordinance was enacted to implement, the court found that adaptive reuse referred to "the conversion of existing buildings so that they may be used for purposes other than those for which they were originally built." Furthermore, the court concluded that § 5.2.6(b)(2) addresses adaptive reuse and renovation of buildings with the goal of encouraging more residential development in the city's residential district by allowing greater density. Here, Hartland's proposed project would convert a warehouse — a wholly nonconforming structure — into twenty-five residential units, while maintaining a small portion, the café, as a preexisting nonconforming use. The court concluded that there was nothing in the language of § 5.2.6(b)(2), or purpose behind the maximum-density exception, that precluded Hartland from continuing an existing nonconforming use in a portion of the building while converting the majority of the structure to conforming residential use. Furthermore, it determined later at trial that the new use of the building would be less harmful or detrimental to the surrounding area than the original warehouse, as required by §§ 20.1.6 and 5.1.8 of the zoning ordinance. See *In re Nott*, 174 Vt. 552, 553, 811 A.2d 210, 211-12 (2002) (mem.) (emphasizing that the whole ordinance must be considered

when determining the effect of a single part). Given the purpose of the maximum density exception, the court's construction of § 5.2.6(b)(2) — as allowing a developer to maintain some preexisting nonconforming use in an otherwise residential project — was appropriate, and we find no reason to disturb its decision.

¶ 11. Landowners further contend that the project does not deserve a density exception because, they claim, most of the existing structure will be destroyed rather than reused. Hartland, in its permit application, represented that the northerly wall of the original building on the site had deteriorated and would need to be rebuilt, and that the roof and westerly wall of the structure would have to be removed to incorporate the new construction it proposed, while facades, masonry walls, foundations, footings, floors, and existing architectural details would be reused. The court concluded that this did not take the project "out of the ambit of § 5.2.6(b)(2)," but rather determined that "[i]t would be an absurd result for § 5.2.6(b)(2) on the one hand to encourage the rehabilitation of existing buildings, the conversion of those buildings to conforming residential use, and the addition of new construction for that purpose, and yet to prevent the removal of the building elements necessary to make the rehabilitation safe for future use, or make the new construction possible at all." See *Bergeron v. Boyle*, 2003 VT 89, ¶ 11 n.1, 176 Vt. 78, 838 A.2d 918 (courts should avoid statutory construction that leads to absurd results). Neither did the court find, nor do landowners claim, that anything in the language of the ordinance suggests that a certain percentage of the original structure must be retained for a project to be considered adaptive reuse. Again, unless clearly erroneous, we are bound by the court's interpretation of the zoning ordinance, and we find no error here. See *In re Bennington Sch., Inc.*, 2004 VT 6, ¶ 11.

¶ 12. Landowners also assert that the proportion of new development is too large to be considered ancillary to the rehabilitation of the existing structure under § 5.2.6(b)(2). Specifically, they argue that "ancillary" connotes "subservient to" or "smaller than" the preexisting structure, whereas the proposed development would be more than twice the size of the original structure. In its decision, the court reasoned that landowners' construction of the term "ancillary" was inconsistent with the former limitation that: "the number of ancillary newly-constructed units shall not exceed one hundred seventy-five (175) per cent of the units contained in the rehabilitated structure(s)." The court further determined that if, as landowners suggest, "the new construction had to be smaller than the rehabilitated existing building, the ancillary newly-constructed units could not have exceeded 100% of the units contained in the rehabilitated structure," which would have rendered the 175% limitation surplusage. As such, the court reasonably concluded that, in the context of the zoning ordinance, "ancillary" is more appropriately defined as "related to or supportive of the rehabilitation of the existing building." We defer to the court's construction of the ordinance language.

¶ 13. Landowners' next argument — that the proposed project does not comply with the zoning ordinance's parking provisions — was initially decided by the Environmental Court on the merits at trial. On appeal, landowners contend that the court erred in calculating the minimum parking requirements for the café and in granting the maximum waiver available in the absence of a traffic management plan. First, with regard to the required parking spaces, the court determined that the forty-seat café required ten parking spaces, based on Table 10-A, which requires one space for every four café seats. Footnote three to Table 10-A further requires an additional parking

space for every seventy-five square feet of floor area without seats but intended for patron use. At trial, however, the court did not undertake this additional calculation, and instead conditioned Hartland's permit on restricting café use so that the required number of parking spaces would not exceed ten — as Hartland had represented, during the proceedings, that it was willing to do.[3] Exercising its discretion under the zoning ordinance, the court waived 50% of the required ten parking spaces based on its finding that there was ample on-street parking and alternative transportation available to the café. Nonetheless, landowners assert that Hartland's proposed project does not comply with the zoning ordinance's parking provisions, and that the court erroneously calculated the number of parking spots required for the project.

¶ 14. Landowners have failed to demonstrate how the court's decision represents reversible error. In their brief, they claim only that the court erred in its calculation of minimum parking spaces under the zoning ordinance, but do not take issue with the court's finding of fact. The court accepted Hartland's representations that it would maintain the café operation at a level that would require no more than ten parking spaces and, further, specifically conditioned Hartland's permit on it doing so "through a binding legal document such as lease agreement, deed, or condominium agreement." Under 24 V.S.A. § 4464(b)(2), the court had authority to attach "reasonable conditions" to approval of the permit to effectuate the purpose of the zoning ordinance and municipal plan. Here, the court acted appropriately in effectuating the parking restrictions in footnote 3 of Table 10-A by requiring Hartland to restrict the patronage of the café to conform to the ordinance's parking limitations, rather than by undertaking the calculation of square footage intended for patron use. Landowners have not established that this in any way undermined the purpose of the parking restrictions in the ordinance, or that they will suffer any harm as a result of the court's conditions. Because we believe that the parking condition obviates landowners' concern about the minimum parking requirements for the project, we find no reason to disrupt the court's decision.

¶ 15. Likewise, landowners' argument that Hartland failed to satisfy the requirement for waiver of parking requirements by not providing a traffic-management plan is unfounded. At the outset, landowners fail to cite a specific zoning provision outlining the requirements for waiver as support for their assertion that Hartland failed to provide the required "traffic management plan to reduce the amount of vehicles . . . seeking a place to park." Furthermore, landowners do not dispute the Environmental Court's findings that the projected use of alternative modes of transportation, Hartland's traffic-congestion analysis, Hartland's study of area parking availability, and Hartland's proposed traffic-calming measures around the project — which include bulb-outs and increased vegetation — result in a reduced need for parking spaces. There is ample evidence in the record to support the court's findings, and we therefore hold that the court did not err in granting a 50% parking waiver to Hartland based on the evidence before it. *Lawson v. Brown's Home Day Care Ctr., Inc.*, 2004 VT 61, ¶ 18, 177 Vt. 528, 861 A.2d 1048 (mem.) (holding that we will reverse trial court findings only if there is no credible evidence to support them).

¶ 16. Finally, landowners argue that the 2004 amendment to § 5.2.6(b)(2) is uncon-

---

[3] The Environmental Court adopted this restriction as a condition to approval of the proposed project in its judgment order, dated September 24, 2007. Hartland's commitment relieved the court's initial uncertainty on summary judgment.

stitutional spot zoning. "Spot zoning consists of zoning that single[s] out a small parcel or perhaps even a single lot for a use classification different from the surrounding area and inconsistent with any comprehensive plan, for the benefit of the owner of such property." *Granger v. Town of Woodford*, 167 Vt. 610, 610-11, 708 A.2d 1345, 1346 (1998) (mem.) (quotation omitted). In determining whether a zoning amendment is spot zoning, the court must consider: "(1) whether the use of the parcel is very different from the prevailing use of other parcels in the area; (2) whether the area of the parcel is small; (3) whether the classification is for the benefit of the community or only to provide a specific advantage to a particular landowner; and (4) whether the change in the zoning classification complies with the municipality's plan." *Id.* at 611, 708 A.2d at 1346. We will not, however, interfere with municipal zoning "unless it clearly and beyond dispute is unreasonable, irrational, arbitrary or discriminatory." *In re Letourneau*, 168 Vt. 539, 544, 726 A.2d 31, 35 (1998) ("[Z]oning ordinances are presumed valid."). Here, the Environmental Court found that the amendment did not amount to spot zoning under any of the criteria enumerated in *Granger*. The court found that the removal of the 175% limitation allowed more parcels, including the one owned by Hartland, to be converted to residential use in residential zoning districts. The amendment, therefore, did not incite anomalous use but instead allowed the use of such parcels to become more similar to current residential uses in those districts. The court further determined that the amendment had the potential to affect numerous parcels in the medium-density residential district[4] and decided that the land area of

the potentially affected parcels was not small. The court also acknowledged that, while Hartland's proposal prompted the amendment, the removal of the limitation applied generally in the medium-density residential districts and would benefit other properties in addition to Hartland's. Finally, the court found that the amendment complied with the city's municipal plan by encouraging an increase in residential development through the adaptive reuse of existing structures and gradually reducing nonconforming uses in the city. See 2001 Burlington Municipal Development Plan, IV-1, 6 (Historic Preservation), IX-12 (Housing Action Plan); see also *In re Casella Waste Mgmt., Inc.*, 2003 VT 49, ¶ 9, 175 Vt. 335, 830 A.2d 60 ("One of the primary goals of zoning is to gradually eliminate nonconforming uses . . . .") Landowners have failed to establish that the amendment to the ordinance — which was adopted only after public hearings before both the Burlington Planning Commission and City Council — is unreasonable, let alone unconstitutional spot zoning, in light of the goals of the adaptive-reuse provision of the ordinance.

¶ 17. As a final matter, we briefly address landowners' argument that the proposed project does not relate harmoniously to the surrounding environment as required by § 6.1.10(a) of the zoning ordinance. The Environmental Court carefully considered the design of the project and determined that "[t]he proposed development relates appropriately to its context." It thus concluded that the project met the requirements of the ordinance. We are directed to nothing in the record that would allow us to conclude otherwise, and we therefore affirm the court's decision. See V.R.A.P. 28(a)(4); *King v. Gorczyk*, 2003 VT 34, ¶ 21 n.5, 175 Vt. 220, 825 A.2d 16.

*Affirmed.*

---

[4] Hartland's evidence showed that the amendment would potentially affect forty-nine properties. Landowners contest this number, but do not contest that

the amendment applied to at least fifteen to twenty properties across the city.