# State of Vermont v. Leon G. Berard

[576 A.2d 118]

No. 87-564

Present: Allen, C.J., Peck and Dooley, JJ., and Barney, C.J. (Ret.) and Springer, D.J. (Ret.), Specially Assigned

Opinion Filed January 19, 1990

Motion for Reargument Denied May 8, 1990

*Jeffrey L. Amestoy,* Attorney General, Montpelier, and *Thomas J. Rushford,* Assistant Attorney General, Waterbury, for Plaintiff-Appellee.

*Walter M. Morris, Jr.,* Defender General, *William A. Nelson,* Appellate Defender, and *Jeffrey Dworkin,* Prisoners Rights Office, Montpelier, for Defendant-Appellant.

**Allen, C.J.** Pursuant to V.R.A.P. 5(b), defendant brings this interlocutory appeal from the denial of his motion to suppress evidence seized during the random search of his prison cell. The certified question for review is whether the routine and random warrantless search of the defendant's cell, conducted without probable cause or any quantum of particularized suspicion, violates the defendant's rights under Chapter I, Article Eleven of the Vermont Constitution. We answer the certified question in the negative.

Defendant, an inmate at the Chittenden County Correctional Center (Center), is presently serving a sentence for assault and robbery. At the time of the search, he was sharing a room in a less restrictive wing of the Center with three other inmates.

The Department of Corrections requires the development of procedures for daily unannounced and irregularly timed searches. Accordingly, the Center has established procedures

that require correctional officers to conduct two random and unannounced "shakedown" searches[1] of inmates' cells during each of the three daily shifts. Corrections officers conduct these searches routinely and randomly at somewhat less frequency than the mandated six searches per day. The searches do not require probable cause or any degree of particularized suspi- cion.

In June of 1987, correctional officials at the Center noted the smell of marijuana smoke in the hallway of the unit where defendant's cell was located. In response, they stepped up the frequency of the routine, random searches. As part of this increased effort, defendant's room was searched. The trial court found that "[o]fficials had neither probable cause nor reasonable suspicion to believe that he or his roommates possessed contraband." Four officers conducted the search and found the marijuana under the radiator. Defendant was charged with possession of a regulated drug in violation of 18 V.S.A. § 4224(a). In a motion to suppress the marijuana seized, defendant argued that corrections officials conducted the search without probable cause and thereby violated Chapter I, Article Eleven of the Vermont Constitution.

After a suppression hearing, the trial court denied defendant's motion, concluding that the search was reasonable in light of the legitimate and overwhelming governmental interests in maintaining security and promoting program goals.

On appeal, defendant renews his argument that the search of his cell violated Chapter I, Article Eleven of the Vermont Constitution. In *Hudson v. Palmer*, 468 U.S. 517, 530 (1984), the United States Supreme Court held that a person incarcerated after conviction for a crime retains no privacy or possessory rights and that the constitutional prohibition against unreasonable searches simply does not apply in a prison cell. Defendant asks that the Court not follow the *Hudson* holding in its interpretation of Article Eleven. In order to accommodate the State's law enforcement needs and Article Eleven's privacy

---

[1] A witness for the State testified at the suppression hearing that the routine, random searches consisted of a strip search of the resident inmates, followed by a search of the cell with the resident inmates present.

values, defendant urges the Court to adopt a warrant requirement with a relaxed probable cause standard, akin to that required of administrative warrants under the Fourth Amendment of the United States Constitution as established by the Supreme Court in *Camara v. Municipal Court*, 387 U.S. 523 (1967).

I.

Chapter I, Article Eleven of the Vermont Constitution provides:

> That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

The language of Article Eleven does not expressly limit its protection to "unreasonable" searches and seizures as does the Fourth Amendment to the United States Constitution. This Court, however, has consistently interpreted Article Eleven as importing the "reasonableness" criterion of the Fourth Amendment. *State v. Jewett*, 148 Vt. 324, 328, 532 A.2d 958, 960 (1986); *State v. Badger*, 141 Vt. 430, 454, 450 A.2d 336, 350 (1982). The parallels between Article Eleven and the Fourth Amendment have raised the question of when and how the state provision differs from the federal.

> Both the self-incrimination and search and seizure provisions of the Vermont Constitution contain wording substantially different from the parallel clauses in the Federal Charter. Thus, it is possible that these clauses could be construed differently from somewhat similar provisions in the Federal Constitution or they may be given the same interpretation even though the language differs.

*State v. Jewett*, 146 Vt. 221, 226–27, 500 A.2d 233, 237 (1985); see *State v. Wood*, 148 Vt. 479, 481–82, 536 A.2d 902, 903–04 (1987).

In *Hudson v. Palmer*, the prisoner contended that the State violated his Fourth Amendment rights by intentionally destroying his noncontraband personal property during a random cell search. Concerned that random, warrantless cell searches could be used to harass inmates, the Court of Appeals held that the shakedown of a single prisoner's property is permissible only if "done pursuant to an established program of conducting random searches of single cells or groups of cells reasonably designed to deter or discover the possession of contraband" or upon reasonable belief that the particular prisoner possessed contraband. 697 F.2d 1220, 1224 (4th Cir. 1983). The United States Supreme Court rejected that solution and concluded that "prisoners have no legitimate expectation of privacy and that the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells." 468 U.S. at 530. Therefore, no prisoner could challenge the reasonableness of a particular search, even if personal, noncontraband property were involved. The Supreme Court based this "bright line" rule upon implicit, fixed assumptions about the nature of prison life and prison administration that override the facts of particular cases and remove from the courts the critical job of reviewing the facts. *Hudson v. Palmer* conclusively presumes that prisoners have no legitimate expectation of privacy in their individual cells that would entitle them to Fourth Amendment protection, and thereby necessarily sanctions any official conduct whatsoever in the name of "legitimate institutional interests." 468 U.S. at 549 (Stevens, J., dissenting).

 This Court has stated that "[i]n drafting Article Eleven, the framers of the Declaration of Rights vested responsibility and authority in the judiciary to review and restrain overreaching searches and seizures by the government." *Wood*, 148 Vt. at 487, 536 A.2d at 907. Thus, we seek to give effect to the design of Article Eleven and decline to follow parallel federal law, such as *Hudson v. Palmer*, which tends to derogate the central role of the judiciary in Article Eleven jurisprudence. *Id.* at 489, 536 A.2d at 908. Whatever the evolving federal standard, when interpreting Article Eleven, this Court will "abandon the warrant and probable-cause requirements, which constitute the stand-

ard of reasonableness for a government search that the Framers established, '[o]nly in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable . . . .'" *O'Connor v. Ortega,* 480 U.S. 709, 741 (1987) (Blackmun, J., dissenting and quoting *New Jersey v. T. L. O.,* 469 U.S. 325, 351 (1985) (opinion concurring in judgment)); see *State v. Record,* 150 Vt. 84, 97, 548 A.2d 422, 430 (1988) (Hill, J., dissenting).

In *O'Connor,* Justice Blackmun suggested a court should invoke a balancing test as the measure of Fourth Amendment values only when the warrant and probable cause requirements do not present a practical alternative and explained:

> Through the balancing test, [courts] then try to identify a standard of reasonableness, other than the traditional one, suitable for the circumstances. The warrant and probable-cause requirements, however, continue to serve as a model in the formulation of the new standard.

480 U.S. at 744 n.8.

We conclude that the same rule should govern our interpretation of Article Eleven. While this Court has not explicitly announced a "special needs" standard in previous cases, we have noted the extraordinary factors underlying the relaxation of the traditional Fourth Amendment and Article Eleven tests. *State v. Record,* 150 Vt. at 89, 548 A.2d at 425–26 (relating to DUI roadblock stops under Article Eleven); *State v. Martin,* 145 Vt. 562, 568–69, 496 A.2d 442, 447 (1985) (relating to DUI roadblock stops under the Fourth Amendment). The interest of the state in the safe and orderly operation of Vermont's prisons is great and the expectation of privacy considerably diminished at best. Still, the maintenance of a "special needs" standard focuses attention on the nature and extent of those needs and allows the courts, as the traditional protectors of Fourth Amendment rights, to pursue the necessary balancing test in a manner calculated to interfere least with preservation of those rights.

■ In this manner we uphold application of Article Eleven to the rights of a prison inmate, as many federal courts so con-

cluded under analogous federal constitutional principles prior to *Hudson v. Palmer*. See, e.g., 468 U.S. at 549 n.19 (Stevens, J., concurring in part and dissenting in part); *Lyon v. Farrier*, 727 F.2d 766, 769 (8th Cir.), *cert. denied*, 469 U.S. 839 (1984); ABA Standards for Criminal Justice 23-6.10 Commentary (2d ed. 1986); Giannelli and Gilligan, *Prison Searches and Seizures: "Locking" the Fourth Amendment Out of Correctional Facilities*, 62 Va. L. Rev. 1045 (1976).

## II.

■ Turning to the present case, we first conclude that the State has carried its burden of demonstrating as a prerequisite to a random search of an inmate's cell[2] that the prison environment presents special needs which "make the warrant and probable-cause requirement impracticable." *New Jersey v. T. L. O.*, 469 U.S. at 351 (Blackmun, J., concurring in judgment). Our conclusion is based in part on the inexorable nature of prison governance in general and in part on the particular circumstances of the facts found by the trial court. See *Bell v. Wolfish*, 441 U.S. 520, 555–57 (1979); *Olson v. Klecker*, 642 F.2d 1115 (8th Cir. 1981).

Though we do not adopt its *rationale*, we share the conclusions of the majority in *Hudson* that if the prisoners' right to privacy prevented random prison cell searches, it would be impossible to accomplish the objectives of guarding against drugs and other contraband, like illicit weapons, thwarting escape, and maintaining a sanitary and healthful environment. See *Hudson v. Palmer*, 468 U.S. at 527. Defendant concedes the need for random cell searches and limits his argument on appeal to the necessity of an administrative search warrant, even

---

[2] The trial court did not consider the issue of "special needs" as a threshold question, but directly considered the reasonableness of the search under a "balancing" analysis. We reiterate that under Article Eleven, until a determination of special needs is made, or some other recognized exception applies, we will presume the necessity of probable cause and a search warrant. Though we differ with the trial court's analysis, and thus decide this case on different grounds, the trial judge's findings are adequate to support our conclusion that the "special needs" test has been met.

if issued on terms less stringent than those for obtaining a traditional warrant.

The trial court also made findings specific to the Center that buttress the general factors upon which we base our conclusion that prison authorities have "special needs" for a random search procedure without the showing of probable cause and a warrant. The trial court found:

> 3. Possession of contraband by inmates is an ongoing concern among correctional officials. Illegal drugs occasionally make their way into the Center; in fact, from time to time, the distinctive odor of marijuana smoke can be detected in the hallways.

The trial court also properly noted that 28 V.S.A. § 102(c)(6) obligates the commissioner of corrections "[t]o maintain security, safety and order at the correctional facilities." It added that "[i]t is difficult to see how the department could fulfill its primary objective of the 'disciplined preparation of offenders for their responsible roles in the open community,' 28 V.S.A. § 1(b), if it did not have an effective procedure for detecting contraband."

## III.

### A.

Having determined that a balancing test could properly be substituted for the probable cause and search warrant requirement under Article Eleven, we must consider the criteria that should be applied in balancing the State's "paramount interest in institutional security" against the inmates' residuum of privacy rights. As the United States Supreme Court noted in *Wolff v. McDonnell*, 418 U.S. 539 (1974):

> [T]hough his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country.

*Id.* at 555–56.

■ The following factors are central to the analysis of the random search of a prison cell: (1) the establishment of clear, objective guidelines by a high-level administrative official; (2) the requirement that those guidelines be followed by implementing officials; and (3) no systematic singling out of inmates in the absence of probable cause or articulable suspicion.[3] In adopting the requirement of clear, objective guidelines for random warrantless cell searches, we share the concern of the Court of Appeals in *Palmer v. Hudson*, that "individual searches may provide an increased opportunity for prison officials to abuse [their] power and utilize searches as a means of harassment," but see the requirement that searches be conducted pursuant to an established program as according "some protection from abusive searches." 697 F.2d at 1224.

We do not agree with the majority in *Hudson* that "[a] requirement that even random searches be conducted pursuant to an established plan would seriously undermine the effectiveness of this weapon." 468 U.S. at 529. A plan need not provide the sort of schedule that would allow inmates to anticipate and thereby thwart a search for contraband. If a plan is established and followed, both inmates and the state will benefit from an articulated standard requiring the limitation of random searches to the purposes for which they are conducted and not for the purpose of harassment or interference with the residuum of privacy retained by prison inmates.[4] Defendant warns that the existence of established guidelines will invite over-reliance by state personnel and that the courts will be lulled into considering the guidelines as the functional equivalent of a war-

---

[3] In *Record*, 150 Vt. at 87, 548 A.2d at 424, this Court identified the six so-called *Martin* factors, 145 Vt. at 571, 496 A.2d at 448, as essential to enable a warrantless stop at a DUI roadblock to pass muster. The special needs of the state in a DUI roadblock differ significantly from those needs in conducting a random search of a prison cell, and a driver is inherently entitled to a higher expectation of privacy than a prison inmate. Therefore, the six *Martin* factors cannot be applied en mass to a random prison cell search.

[4] We share the concerns expressed by Justice Stevens in his dissent to *Hudson v. Palmer* that "[d]epriving inmates of any residuum of privacy or possessory rights is in fact plainly *contrary* to institutional goals." 468 U.S. at 552 (emphasis in original).

rant. We have no such illusions. Guidelines, properly implemented and consistently followed, serve a worthy instructional purpose and may constrain prison officials from unduly intrusive conduct. However, this Court has never measured Article Eleven rights by the intensity of government's self-proclaimed resolve.[5] In a judicial context, the existence of guidelines will serve as a basis to determine if prison policy in practice generally matches its theory, or whether corrections officials consistently and purposefully exercise prison cell searches for purposes beyond "institutional security and internal order." *Hudson*, 468 U.S. at 528.

Far from objecting to the imposition of a plan requirement, the State argues on appeal that the cell search was conducted pursuant to guidelines consistent with *Martin*. While defendant urges that we impose a warrant requirement under a relaxed standard of probable cause, he did not at trial specifically argue the inadequacy of the guidelines in place during the search presently in issue. Those guidelines are not ideal. However, the present record does not indicate that defendant was targeted for harassment or that his noncontraband property was seized or destroyed. The guidelines, therefore, formed an adequate basis to conduct the search.

Nor does defendant contend that the search was arbitrarily aimed at him, in violation of the third criterion announced today.[6] The trial court findings clearly indicate that

---

[5] With a caveat, we agree with the observation that "[w]ritten regulations, specifying the frequency and intensity of the search, would limit the discretion of the authorizing individual." Giannelli and Gilligan, 62 Va. L. Rev. at 1084. It is clear, however, that not all agencies follow their own regulations. Making the adoption of regulations mandatory, with no opportunity for independent review of their due observance, is an empty exercise. The views we express today emphasize the instructional and hortatory value of regulations, but do not rely on their adoption as a safeguard against their being violated or ignored.

[6] There is an apparent contradiction in the relationship of the element of randomness to the protection against arbitrariness that is central both to *Martin* and to the three guidelines we announce today in connection with prison cell searches. In the context of a roadside DUI search, arbitrary selection must be ruled out by the regularity of the selection procedure, which must be guided by a preestablished protocol (e.g., to stop every car, every second car, tenth car, or the like). There can be no selection left to the arbitrary

defendant's cell was searched as a result of the application of broad policy directives:

5. Procedures for shakedown searches of inmates' rooms are in effect at the Chittenden County Correctional Center pursuant to a procedural directive dated March 3, 1987. Also, correctional officers have been instructed to conduct two random, unannounced searches of inmates' rooms during each of the three daily shifts. In actuality, however, the number of searches is less; during the third shift, for example, only about five rooms per week are searched.

. . . .

7. In early June, 1987, correctional officials in the House Unit noticed the smell of marijuana smoke in the hallway. As a result, they increased the frequency of the routine, random room searches. For example, during the third shift, four such searches were conducted one day and three on another.

8. On June 5, the defendant's room was searched as part of this increased effort during third shift. Officials had neither probable cause nor reasonable suspicion to believe that he or his roommates possessed contraband.

Defendant does not suggest that he was a particular target or that the findings supporting the conclusion that the search was truly random were erroneous.

### B.

██ Defendant's main contention is that this Court should retain the requirement of a warrant "while redefining, and substantially easing, the standard upon which such a warrant may issue." Defendant cites *Camara v. Municipal Court*, 387 U.S. 523 (1967), in which the United States Supreme Court established the requirement of a warrant based on *generalized* probable cause for administrative inspections for housing code

---

discretion of the police. In the context of a prison cell search, however, randomness is the keynote to an effective procedure, and since the prison population is a relatively fixed universe (in contrast to the vehicles stopped at a roadblock), random selection for searching on any particular date does not amount to arbitrary selection.

violations, and cases applying a similar rationale to fire inspections (*See v. City of Seattle*, 387 U.S. 541 (1967)) and OSHA inspections (*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978)). Though defendant's brief stresses the practicality and fairness of the *Camara*-style warrant requirement for random cell searches, his main point on appeal is simply that a random cell search must be preceded by probable cause and a search warrant—that Article Eleven does not allow less. We conclude today that the State does not have an unfettered right to invade the privacy of prison inmates and, in conducting random searches, must adhere to the basic safeguards we have announced. Defendant has not demonstrated that showing probable cause and obtaining a warrant, even under a reduced standard of probable cause, is prudent or necessary. Random searches, because of the uncertainty they involve, are one of the most effective weapons against the increasing presence of drugs, weapons and other contraband in our prisons. Were the Court to require a warrant founded upon generalized probable cause, the benefits of uncertainty would decrease, and the effectiveness of the prison cell search would be seriously undermined. See *Hudson*, 468 U.S. at 529.

## C.

As the State has demonstrated the special need for random searches of prison cells, we must proceed to balance the State's interest in effective searches against that of an inmate in avoiding unreasonably invasive or arbitrary treatment. The reasonableness of a warrantless and random search of a prisoner's cell hinges on a balancing of the governmental interest in the security of its prisons against the privacy and possessory interests of the prisoner. The State has established that the Center conducted the search pursuant to a written plan, that the plan was not unreasonable, and that it was adhered to during the search. Defendant has not demonstrated any particular pattern of arbitrary conduct or any particularized unfairness in the conduct of the search in question. Like the Supreme Court in *Hudson v. Palmer*, 468 U.S. at 527, though on independent and different grounds under our Constitution, "[w]e strike the

balance in favor of institutional security" and hold that the routine, random and warrantless search of a prisoner's cell in the case before us was reasonable and not in violation of Article Eleven.

*The certified question is answered in the negative.*