2013 VT 13A

# State of Vermont v. Thomas Bogert, Jr.

[109 A.3d 883]

No. 11-253

Present: Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.[1]

Opinion Filed October 10, 2014

---

[1] Justice Crawford was present for oral argument, but did not participate in this decision.

*William H. Sorrell*, Attorney General, and *John Treadwell*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Dawn Matthews*, Prisoners' Rights Office, Montpelier, for Defendant- Appellant.

¶ 1. **Robinson, J.** This case tests the permissibility, under the Vermont Constitution, of a warrantless and suspicionless search of a convicted sex offender furloughed to his home and subject to a standard condition of a conditional-reentry agreement that provides for such searches. We conclude that the search in this case satisfied the requirements of the Federal and Vermont constitutions and, accordingly, affirm.[2]

¶ 2. In January 2005, defendant Thomas Bogert, Jr. pleaded guilty to two counts of possession of child pornography, no contest to one count of aggravated sexual assault, and no contest to one count of sexual assault. On the two sexual-assault charges, defendant was sentenced concurrently to a minimum of three years and a maximum of fifteen years, all suspended, and was placed on probation subject to a series of conditions. On the two possession charges, defendant was sentenced to zero-to-four years each, to run consecutively both with each other and with the sexual-assault sentences. The expectation underlying this two-track sentence was that defendant would serve the sentences for the child pornogra-

---

[2] By entry order dated June 26, 2013, we granted defendant's motion for reargument in this case. We hereby withdraw our prior opinion of February 22, 2013 and replace it with this opinion.

phy charges on conditional-reentry status so that he could secure treatment in the community in connection with those charges, and that after his completion of those sentences — totaling up to eight years — he would remain on probation for some period. Defendant signed a probation order that included thirty-five conditions. One condition prohibited defendant from possessing child pornography, and another special condition, Condition #38, provided:

> You shall not possess or utilize any computer that has [internet] access without prior approval by your [probation officer] and supervised by a person approved by your PO. If your PO approves any use of a computer with internet access as described above, that computer and any related media will be subject to periodic inspection to assure compliance with your conditions of probation.

¶ 3. In February 2007, defendant admitted to violating his probation in connection with the sexual-assault charges after testing positive for cannabinoids. At the sentencing hearing for the violation of probation (VOP), the court maintained defendant's existing probation conditions and added a condition that he not possess any pornography in his home. His conditions already prohibited him from possessing child pornography. Defendant signed and agreed to the special conditions of probation and did not appeal the terms of his probation.

¶ 4. In July 2007, defendant signed a terms of release/ supervision agreement with the Department of Corrections (DOC) in connection with his serving the incarcerative portion of his split sentence in the community on a conditional-reentry status. The agreement contained the following standard condition: "I agree to submit my person, place of residence, vehicle or property to a search at any time of the day or night by the department of corrections staff." Defendant at this point was subject to a dual status — serving his sentence in the community on the possession charges and on probation for the sexual-assault charges — and was subject to the conditions of both the probation agreement and the conditional-reentry agreement.

¶ 5. In March 2009, two community correctional officers from DOC and a state trooper conducted a "sex-offender compliance check" at defendant's home. They collected evidence from computers that demonstrated a violation of the terms of defendant's

conditional release and the terms of his probation. DOC took defendant into custody and suspended his conditional-reentry status. In addition, the State issued a probation-violation complaint against defendant for violation of the probation conditions prohibiting possession or use of a computer with internet access without prior approval and prohibiting possession of pornography.

¶ 6. Defendant filed motions to dismiss the probation-violation complaint and to suppress the evidence gathered in the search of his home. Defendant argued that the underlying probation conditions prohibiting him from possessing pornography and authorizing warrantless searches were unconstitutionally overbroad and vague, and lacked a sufficient nexus to his conviction. With respect to the suppression issue, defendant argued that the search of his residence was involuntary and unreasonable pursuant to both the U.S. and Vermont constitutions. See U.S. Const. amend. IV; Vt. Const. ch. I, art. 11.

¶ 7. The court concluded that defendant's motion constituted an impermissible collateral challenge to probation conditions not raised on direct appeal. See *State v. Austin*, 165 Vt. 389, 401-02, 685 A.2d 1076, 1084-85 (1996). The court also held that defendant's status on conditional reentry made "his residence effectively . . . his prison cell," and that the search pursuant to DOC guidelines complied with the requirements for conducting routine, random, warrantless searches of inmates' cells. See *State v. Berard*, 154 Vt. 306, 306-14, 576 A.2d 118, 119-24 (1990). Defendant appeals the trial court's denial of his motion to suppress.

¶ 8. "On appeal of a motion to suppress, we review the trial court's legal ·conclusions de novo and its factual findings for clear error." *State v. Paro*, 2012 VT 53, ¶ 2, 192 Vt. 619, 54 A.3d 516 (mem.).

## I.

¶ 9. ■ First, we consider defendant's argument under the Fourth Amendment to the U.S. Constitution. The U.S. Supreme Court has recognized exceptions to the general rule that searches must be undertaken "only pursuant to a warrant (and thus supported by probable cause . . . )" in certain categories of searches in which "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quotation omitted). Accordingly, the Court has allowed warrant-

less, work-related searches by supervisors of government employees' desks and offices without probable cause and warrantless searches by school officials of some student property without probable cause. *Id.* The Court has also held that "in certain circumstances government investigators conducting searches pursuant to a regulatory scheme need not adhere to the usual warrant or probable-cause requirements as long as their searches meet 'reasonable legislative or administrative standards.'" *Id.* (quoting *Camara v. Mun. Ct.*, 387 U.S. 523, 538 (1967)).

¶ 10. ■ In *Griffin*, the Supreme Court considered a warrantless search of a probationer conducted by probation officials pursuant to an administrative regulation allowing probation officers to search a probationer's home without a warrant if there were "reasonable grounds" to believe contraband was present. *Id.* at 870-71. The Court acknowledged that "[a] State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Id.* at 873-74. The Court noted that probation was on "a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service," and identified a number of different options between those extremes, "including confinement in a medium- or minimum-security facility, work-release programs, 'halfway houses,' and probation — which can itself be more or less confining depending upon the number and severity of restrictions imposed." *Id.* at 874. The Court recognized that probationers, like parolees, "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'" *Id.* (alteration in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). Those restrictions are designed to promote the rehabilitative goals of probation, and to ensure that the community is not harmed by the probationer's being at large — goals that justify the exercise of supervision to ensure compliance with the restrictions. *Id.* at 875.

¶ 11. Given these considerations, the Court concluded that supervision "is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.* The Court recognized that a

state's ability to impinge on a probationer's privacy is not unlimited, but relying on a special-needs analysis approved a search conducted by probation officials under a state regulation that authorized warrantless searches of probationers upon the approval of a probation officer's supervisor and the existence of "reasonable grounds" to believe contraband was present. *Id.* at 880.

¶ 12. The Court subsequently considered the constitutionality of a warrantless search of a probationer's home by a law enforcement officer that was not conducted pursuant to a probation supervision scheme as in *Griffin. United States v. Knights*, 534 U.S. 112 (2001). The defendant in *Knights* had signed a probation condition that required him to "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Id.* at 114 (alteration in original). The Court did not extend the special-needs rationale relied upon in *Griffin*, but instead applied a "general Fourth Amendment approach of examining the totality of the circumstances, with the probation condition being a salient circumstance." *Id.* at 118 (quotation omitted). The Court determined that it was reasonable to conclude that the search condition would further the goals of rehabilitation and protecting society that it had identified in *Griffin*, and stressed that the clear and unambiguous probation condition "significantly diminished [the defendant's] reasonable expectation of privacy." *Id.* at 119-20. Balancing the defendant's privacy rights against the state's legitimate interests, the Court concluded that the Fourth Amendment required no more than a reasonable suspicion for a search of the probationer's home. *Id.* at 121. Because the state undisputedly had reasonable suspicion to support the search, the Court expressly declined to decide the question of whether the probation condition purporting to allow for a *suspicionless* search was constitutional. *Id.* at 120 n.6.

¶ 13. Five years later, in *Samson v. California*, the Court considered the constitutionality of a suspicionless search — this time of a parolee. A police officer stopped the defendant in the street and, knowing him to be on parole, conducted a warrantless search. 547 U.S. 843, 846-47 (2006). California law required, as a condition of parole, that parolees " 'agree in writing to be subject to search or seizure by a parole officer or other peace officer at

any time of the day or night, with or without a search warrant and with or without cause.'" *Id.* at 846 (quoting California statute).

¶ 14. ■ The Court considered "the totality of the circumstances to determine whether [the] search [was] reasonable within the meaning of the Fourth Amendment." *Id.* at 848 (quotation omitted). With respect to the defendant's interests, the Court said that "on the continuum of state-imposed punishments . . . parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Id.* at 850 (quotation omitted). The Court explained that "parole is an established variation on imprisonment of convicted criminals. The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Id.* (quotation and alteration omitted). The Court cited the First Circuit favorably for the proposition that "'on the . . . continuum of possible punishments, parole is the stronger medicine; ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers.'" *Id.* (quoting *United States v. Cardona,* 903 F.2d 60, 63 (1st Cir. 1990)). Reviewing a litany of restrictions on liberty applicable to parolees outside of custody — from limitation on travel to reporting requirements concerning changes in employment — the Court reasoned that "[t]he extent and reach of these conditions clearly demonstrate that parolees like petitioner have severely diminished expectations of privacy by virtue of their status alone." *Id.* at 852. The Court pointed to the defendant's acceptance of the search condition as a critical factor and concluded that the defendant "did not have an expectation of privacy that society would recognize as legitimate." *Id.*

¶ 15. ■ On the other side of the balance, the Court found the state had an "'overwhelming interest'" in supervising parolees because, as demonstrated by the nearly seventy percent recidivism rate of California parolees, "'parolees are more likely to commit future criminal offenses.'" *Id.* at 853 (alteration omitted) (quoting *Pa. Bd. of Probation & Parole v. Scott,* 524 U.S. 357, 365 (1998)). The Court focused on the state's interest in "reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees." *Id.* The Court accepted that "given the number of inmates the State paroles and its high

recidivism rate, a requirement that searches be based on individualized suspicion would undermine the State's ability to effectively supervise parolees and protect the public from criminal acts by reoffenders" by affording those parolees a greater opportunity to "anticipate searches and conceal criminality." *Id.* at 854. In light of the above, the Court concluded "that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id.* at 857.

¶ 16. ■ In light of *Samson*, defendant's federal constitutional claim is doomed to fail. His Fourth Amendment expectation of privacy, given his conditional-reentry status subject to the agreed-upon condition that he submit to a search at any time, is no greater than that of the parolee defendant in *Samson*, and the State's supervision goals are no weaker than those of California. Accordingly, we reject defendant's Fourth Amendment challenge to the search in this case.

## II.

¶ 17. ■ ■ Chapter I, Article 11 of the Vermont Constitution, though "similar in purpose and effect" to the Fourth Amendment to the U.S. Constitution, provides its own independent protection "that in many circumstances exceeds the protection available from its federal counterpart." *State v. Martin*, 2008 VT 53, ¶ 9, 184 Vt. 23, 955 A.2d 1144. Our analysis under Article 11 of the Vermont Constitution follows a different path from the analysis under the Federal Constitution, but ultimately leads to the same type of balancing test in this case.[3] Pursuant to Article 11, Vermont continues to adhere to the "special needs" framework, in which the State may depart from the warrant and probable-cause requirements "only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Berard*, 154 Vt. at 310-11, 576 A.2d. at 120-21 (quotation and alteration omitted). In such cases, we apply a balancing test "to identify a standard of reasonableness, other than the traditional one, suitable for the circumstances." *Id.* at 311, 576 A.2d at 121 (quotation omitted). However, "[t]he warrant and probable-cause

---

[3] Article 11 states: "That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation . . . ought not to be granted." Vt. Const. ch. I, art. 11.

requirements . . . continue to serve as a model in the formulation of [a] new standard." *Id.* (quotation omitted). See also *State v. Medina*, 2014 VT 69, ¶ 14, 197 Vt. 63, 102 A.3d 661 ("If we find a special need [beyond the normal need for law enforcement], our next step is to 'turn to a balancing of the competing public and private interests at stake.'" (quoting *Martin*, 2008 VT 53, ¶ 21)); *State v. Lockwood*, 160 Vt. 547, 559-60, 632 A.2d 655, 662-63 (1993).

¶ 18. ■ In this case, the existence of a special need apart from ordinary law enforcement is not in serious question. In *Lockwood*, we recognized that "the special needs of the state in administering probation" allow a departure from the warrant and probable cause requirements, and require a balancing of probationers' rehabilitative needs, concerns for protection of the community, and probationers' Article 11 interests. 160 Vt. at 556, 632 A.2d at 661. In reaching this conclusion, we relied in part on the U.S. Supreme Court's decision in *Griffin*, in which the Court acknowledged that a state's operation of a probation system "presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." 483 U.S. at 873-74. The need to supervise and promote offender rehabilitation, and the need to protect the public against identified risks of recidivism, are goals wholly apart from ordinary law enforcement, which may justify warrantless searches and seizures with respect to individuals under DOC supervision. We have also recognized that in a prison environment the goals of "guarding against drugs and other contraband, like illicit weapons, thwarting escape, and maintaining a sanitary and healthful environment" likewise justify a departure from the ordinary warrant and probable-cause requirements. *Berard*, 154 Vt. at 312, 576 A.2d at 121-22. Given that we have previously acknowledged special needs across the corrections continuum — from incarceration to probation — we have no problem concluding that a special need exists in the context of a convicted sex offender released into the community on conditional reentry.

¶ 19. The more difficult question is how to strike an appropriate balance between the State's nonlaw enforcement objectives and defendant's privacy interests and whether, in particular, the State was required to show reasonable individualized suspicion before searching defendant's home and computer.

A.

¶ 20. Defendant's privacy interests are significantly compromised here for a host of reasons. First, defendant signed a document reflecting the terms of his release on conditional reentry, including an agreement to "submit [his] person, place of residence, vehicle or property to a search at any time of the day or night by the department of corrections staff." The fact that defendant signed the conditional-reentry agreement is not necessarily dispositive with respect to the constitutionality of the ensuing search conducted by the State under that agreement, but that agreement, which he accepted to avoid further incarceration, left defendant with a significantly diminished privacy expectation. *Id.*

¶ 21. ■ Second, defendant signed (and did not appeal) a probation agreement prohibiting him from accessing a computer with internet access without prior approval from a probation officer, and agreeing that, if he were allowed to possess a computer, the State could periodically search that computer and any related media to assure compliance with his conditions of probation. Defendant's agreement not to access the internet without permission reflects a significantly compromised expectation of privacy. The fact that the condition further authorized periodic searches of the computer if he had been authorized to access one, which he was not in this case, further put defendant on notice of the limits of his privacy. See, e.g., *Samson*, 547 U.S. at 852 (explaining that "acceptance of a clear and unambiguous search condition" significantly diminishes offender's reasonable expectation of privacy).

¶ 22. Third, and closely related, the search in question here had a reasonable nexus to the State's special need in light of defendant's underlying offenses. Defendant was convicted of possession of child pornography and aggravated sexual assault on a child. The child pornography charges involved images downloaded from the internet. He was subject to probation conditions in furtherance of his specific rehabilitative goals, as well as for public protection, requiring that he not possess pornography — whether adult pornography or child pornography. Previously agreed-to, unwarned searches of defendant's home and computer are reasonably tailored to the State's rehabilitative and public-protection goals given the underlying facts in this case, and defendant's expectation of privacy against such searches is quite low. See

*Lockwood,* 160 Vt. at 558, 632 A.2d at 662 (concluding that sentencing court's "express[ed] concerns regarding defendant's compulsive sexual urges provided . . . sufficient guidance" to probation officers conducting search to meet the requirement "that the condition be narrowly tailored to fit the circumstances of the individual probationer").

¶ 23. Finally, defendant has been furloughed to a conditional-reentry program. His status alone significantly compromises his reasonable expectation of privacy. Under Vermont law, conditional reentry into the community allows an offender to serve part of a sentence in the community. 28 V.S.A. § 723(a). The status "shall in no way be interpreted as a probation or parole of the offender, but shall constitute solely a permitted extension of the limits of the place of confinement for offenders committed to the custody of the Commissioner [of the Department of Corrections]." *Id.* § 808(c). As the U.S. Supreme Court explained in upholding suspicionless searches of parolees,

> parole is an established variation on the imprisonment of convicted criminals. . . . The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence. In most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements.

*Samson,* 547 U.S. at 850 (alteration in original) (quotations omitted). The same can be said for conditional-reentry status — a status designed to foster continuation of "the process of reintegration initiated in a correctional facility," 28 V.S.A. § 808(a)(6), and a status that is even closer to incarceration than parole. *Id.* § 725 (providing department may recommend parole for offender sentenced for one or more listed crimes when offender has "successfully completed 180 days of supervision in a conditional reentry program").

¶ 24. Moreover, the restraints on defendant's individual liberty associated with his conditional-reentry status are significant. Individuals on conditional-reentry status may be accompanied by a DOC employee and subjected to electronic monitoring through technologies "such as global position monitoring, automated voice recognition telephone equipment, and transdermal alcohol monitoring equipment to enable more effective or efficient supervision."

*Id.* § 808(b). An individual's ability to remain in the community under supervision is conditioned on the offender's progress in reentry programs. *Id.* §§ 722(1), 723. Defendant was subject to requirements that he not leave the state without written DOC permission; that he allow DOC agents to visit him in his home, workplace, or other location at any times; that he submit to searches by DOC staff at any time; that he not drive a motor vehicle without DOC approval; and that he submit to urine screens or Alco-sensor tests upon request. · Special conditions imposed on defendant included a limit on people with whom he was permitted to associate; a requirement that DOC approve his residence; a ban on possessing any weapon; a requirement that defendant provide DOC staff with the name of the medication and prescribing physician with respect to any medication prescribed for him; a daily curfew; and a requirement that he remain at his residence unless specifically authorized to be elsewhere.

¶ 25. The State's interest in conducting a suspicionless search of a convicted sex offender at home on conditional-reentry furlough, meanwhile, is strong. The important rehabilitative function of our corrections system extends far beyond prison walls, and the State's interest in "reducing recidivism and thereby promoting reintegration and positive citizenship" among those released on conditional-reentry furlough is no less weighty than the State of California's was in *Samson*, 547 U.S. at 853-54. In the context of an offender convicted of crimes involving downloading child pornography from the internet, the ability to monitor an offender's access to and use of the internet while on conditional reentry is reasonably tailored to the State's public-protection and rehabilitative goals.

¶ 26. In light of the above factors — the clarity of the conditions agreed to by defendant, their nexus to the State's goals and defendant's legitimate expectation of privacy, and defendant's status on conditional reentry — we conclude that defendant's privacy interest in this case was quite weak, and the State's countervailing interests in promoting defendant's rehabilitation and protecting the community was strong. Accordingly, reasonable

individualized suspicion was not a prerequisite to DOC's search of defendant's home and computer in this case.[4]

## B.

¶ 27. Our conclusion that the search in this case did not require individualized suspicion does not imply that the State faces no limits in searching defendants' homes and computers. Even in the context of warrantless searches of inmates' cells within a prison, we have identified three factors central to our analysis of the permissibility of a random search of a prison cell: "(1) the establishment of clear, objective guidelines by a high-level administrative official; (2) the requirement that those guidelines be followed by implementing officials; and (3) no systematic singling out of inmates in the absence of probable cause or articulable suspicion." *Berard*, 154 Vt. at 314, 576 A.2d at 122. Because the State had established that the search was conducted pursuant to a written plan that was not unreasonable and that the plan was followed during the search, and because the defendant did not show any particular pattern of arbitrary conduct or particularized unfairness in the conduct of the search, we concluded that the random search of the inmate's cell did not violate his "residuum of privacy rights." *Id.* at 313, 317-18, 576 A.2d at 122, 124.

¶ 28. Defendant argues that even if only the *Berard* framework, as opposed to a "reasonable suspicion" requirement, applies here, the trial court failed to determine that the search of defendant's house was a random compliance check as required, and did not make any finding that defendant was not singled out.

¶ 29. ■ Defendant raises this argument for the first time on appeal; before the trial court, defendant argued for suppression solely on the legal basis that a search without reasonable suspicion violated Article 11, and did not offer or request an evidentiary hearing on the question of whether the "sex offender

---

[4] We recognize that many of the factors identified above may also apply in the context of individuals on probation, where we have applied a "reasonable grounds" standard to some searches. *Lockwood*, 160 Vt. at 559, 632 A.2d at 663. We note that " '[o]n the . . . continuum of possible punishments, parole is the stronger medicine; ergo, parolees enjoy even less of, the average citizen's absolute liberty than do probationers.' " *Samson*, 547 U.S. at 850 (quoting *Cardona*, 903 F.2d at 63). Offenders furloughed into the community on conditional-reentry status are subject to even "stronger medicine" than parole. For that reason, our conclusion in this case is not inconsistent with our holding in *Lockwood*.

compliance check" that gave rise to the disputed search satisfied the criteria we articulated in *Berard*. Had defendant argued below that the search also failed to meet the criteria of a permissible random search pursuant to *Berard*, the trial court would have been prompted to take evidence and to make findings addressing that argument. This is precisely the reason we do not address arguments on appeal that were not raised below. *Bull v. Pinkham Eng'g Assocs.*, 170 Vt. 450, 459, 752 A.2d 26, 33 (2000) ("Contentions not raised or fairly presented to the trial court are not preserved for appeal.").[5]

*Affirmed.*

---

[5] Defendant moved for reargument following the issuance of our now-withdrawn opinion on the ground that in that opinion we relied upon a case, *Conway v. Cumming*, 161 Vt. 113, 636 A.2d 735 (1993), that is inapplicable and has arguably been overruled. We need not address the *Conway* decision, or the broader question of whether and to what extent individuals on conditional-reentry furlough have a protected liberty interest, as we resolve this case solely on Fourth Amendment and Article 11 grounds.

[1] Justice Crawford was present for oral argument, but did not participate in this decision.