NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 45

No. 23-AP-271

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Bennington Unit, |
| | Criminal Division |
| | |
| Allan Washburn | June Term, 2024 |

Kerry Ann McDonald-Cady, J.

Evan Meenan, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Briana Hauser, Appellate Defender, Montpelier, for
  Defendant-Appellant.

PRESENT: Reiber, C.J., Eaton, Carroll and Waples, JJ., and Dooley, J. (Ret.),
         Specially Assigned

¶ 1.     **EATON, J.**  Defendant Allan Washburn appeals a criminal division order granting the State's motion for civil forfeiture of his dog, Chad, based on a finding that he subjected the dog to cruelty. On appeal, defendant argues that the criminal division lacked jurisdiction over the forfeiture proceeding because Chad was not seized under 13 V.S.A. § 354, that the State failed to prove animal cruelty by clear and convincing evidence under 13 V.S.A. § 352, and that the criminal division erred in admitting lay witness testimony regarding the internal temperature of defendant's car under Vermont Rule of Evidence 701. Because we find no error with these issues, we affirm.

¶ 2.     The following are the relevant, undisputed facts drawn from the record. On April 15, 2022, Animal Control Officer Daniel Hollister arrived at a Bennington parking lot and

observed a crowd of people encircling a car that belonged to defendant. Officer Hollister approached the car, peered into it, and found Chad, a Siberian husky, locked inside with the windows rolled down approximately one- and one-half inches. He reported it was "unseasonably warm" that day and determined, via an infrared thermometer, that the car's internal temperature was 97.4 degrees. Officer Hollister also observed that Chad was unable to stand up or move around inside the car, which was brimming with trash and spoiled food, and that Chad had no access to water. Based on this, he concluded that Chad was "in moderate distress." Defendant returned to his car five to ten minutes later and was issued a criminal citation for animal cruelty.

¶ 3. On May 11, 2022, Bennington K9 Officer Robert Murawski responded to another call of a dog in distress at the same parking lot. On arrival, he discovered Chad locked in defendant's car, panting excessively with access to no water. Chad was removed from the car and brought to a local animal hospital to receive medical attention. Chad was thereafter returned to defendant's custody.

¶ 4. On June 8, 2022, Officer Murawski responded to yet another report of a dog left in a car in the same parking lot and again found Chad locked inside defendant's car. When he arrived on scene, Officer Murawski observed that defendant's car was parked in the sun, had its windows rolled down only half-an-inch, and had no air conditioning running. He noticed as well that Chad again had no access to water and that defendant's car remained full of trash and rotting food, which meant Chad did not have room to move around and had nowhere to lie except on a pile of garbage on the car's passenger seat. He also saw that Chad was "excessively panting" and had a "swollen tongue," both of which he recognized as early signs of heat exhaustion in dogs. Officer Murawski waited approximately ten to fifteen minutes until defendant returned to the car, at which time he took defendant into custody. He then ordered defendant to follow him by car to the Bennington police station.

¶ 5.    At the station, Officer Murawski left Chad in defendant's car, which was now parked in the shade with the air conditioning on, while he processed defendant's arrest inside the station. Based on defendant's arrest, the criminal division issued temporary conditions of release under Vermont Rule of Criminal Procedure 5. One of the conditions required defendant to "surrender any and all pets to the Bennington PD on 06-08-22." Complying with this order, defendant surrendered Chad to Bennington police that day. The police brought Chad to the Second Chance Animal Center in Bennington, where Chad was later examined by a veterinarian. The State charged defendant with cruelty to animals in violation of 13 V.S.A. § 352(3) on June 13. Based on the allegations of cruelty, the State then filed a motion for civil forfeiture of Chad in the criminal division under 13 V.S.A. § 354(d).

¶ 6.    During the civil forfeiture hearing, the State presented evidence about the three parking lot incidents from four witnesses. Officer Hollister testified about his observations on April 15. Officer Murawski likewise testified to what he saw on both May 11 and June 8. Based on his police K9 training, which included training about the effects of internal car temperatures on dogs, Officer Murawski also estimated that the car's interior (given the external temperature of seventy-eight degrees) was likely between 105 and 110 degrees on June 8. The court permitted this estimate over defendant's objection. Lastly, two humane officers from the Second Chance Animal Center testified that Chad was "underweight for his size" and suffered from a "lack of . . . nutrition" on his arrival at the Animal Center. The humane officers also averred that Chad was initially "weak" and lacked muscle mass, which rendered him unable to run without falling and caused him to lose balance easily and "flop over." One humane officer considered Chad's atrophy consistent with dogs that had received a "lack of exercise" and had spent long periods confined in small spaces. His testimony further revealed that defendant once attempted to feed Chad rotten moldy food, which the officer prevented, and that Chad required medical attention including vaccines and parasite treatments while at the Animal Center.

3

¶ 7.    Based on evidence presented at the civil forfeiture hearing, the court found by clear and convincing evidence that the State established that defendant engaged in animal cruelty under 13 V.S.A. § 352.   See 13 V.S.A. § 354(f)(1) (permitting civil forfeiture of animal if "the State . . . establish[es] by clear and convincing evidence that the animal was subjected to cruelty . . . in violation of section 352").  In its decision, the court credited the witnesses' testimony about Chad being underweight and malnourished, the cramped and unsanitary space Chad was often confined to in defendant's car, and Chad's weakened state on arriving at the Animal Center. The court also relied on evidence of the high temperature inside defendant's car and found, "most significant[ly]," that Chad had no access to water when left in the heat during these incidents. Based on this animal cruelty determination, the court granted the State's motion for civil forfeiture of Chad pursuant to 13 V.S.A. § 354.  This appeal followed.

¶ 8.    On appeal, defendant raises three arguments: (1) that the criminal division improperly exercised its civil forfeiture authority under 13 V.S.A. § 354 because Chad was not seized pursuant to any of the statutory definitions of seizure; (2) that the State did not provide sufficient evidence to meet its burden of demonstrating by clear and convincing evidence that defendant abused Chad under 13 V.S.A. § 352; and (3) that the court admitted improper lay opinion testimony under Vermont Rule of Evidence 701 by permitting Officer Murawski to estimate the internal temperature of defendant's car on June 8.  We address each argument in turn.

I. Exercise of Forfeiture Authority

¶ 9.    Defendant's first argument, that the court lacked authority to order civil forfeiture of Chad, rests on a claim that Chad was not properly "seized" under 13 V.S.A. § 354(d).  **14.** Section 354(d) authorizes the State to institute civil forfeiture proceedings in the criminal division "[i]f an animal is seized under this section."  Section 354(b), in turn, sets out three means of seizure: (1) where the owner voluntarily surrenders the animal, (2) where the animal is seized pursuant to a lawful warrant, or (3) where the animal is seized without a warrant if its "life is in

4

jeopardy and immediate action is required to protect the animal's health or safety." Accordingly, defendant argues that because Chad was surrendered based on a condition of release, rather than seized under any of these provisions, the court improperly granted the State's forfeiture motion.

¶ 10. Defendant concedes that this argument was not raised below, and it is well settled that if "issues [are] not raised at trial," we generally "will not review them on appeal." Follo v. Florindo, 2009 VT 11, ¶ 14, 185 Vt. 390, 970 A.2d 1230. We require parties to raise issues below because a failure to preserve an issue deprives the opposing party "of an opportunity to develop a factual record" and denies the court the chance "to take evidence," "make findings," and render a decision for our review. State v. Nash, 2019 VT 73, ¶¶ 15-16, 211 Vt. 160, 221 A.3d 386 (quotation omitted); State v. Bogert, 2013 VT 13A, ¶ 29, 197 Vt. 610, 109 A.3d 883. Defendant argues, however that his claim involves subject-matter jurisdiction, which this Court has recognized need not be preserved and can be raised "for the first time on appeal." Braun v. Greenblatt, 2007 VT 53, ¶ 7, 182 Vt. 29, 927 A.2d 782 (quotation omitted); Mullinnex v. Menard, 2020 VT 33, ¶ 11, 212 Vt. 432, 236 A.3d 171.

¶ 11. A court's subject matter jurisdiction "is a concept easy to confuse with the simple authority to act." Nat. Res. Bd. Land Use Panel v. Dorr, 2015 VT 1, ¶ 14, 198 Vt. 226, 113 A.3d 400. Our prior cases have recognized that an issue is one of subject-matter jurisdiction, and thus can be raised for the first time on appeal, only where a party disputes "the power of a court to hear and determine a general class or category of cases." Lamell Lumber Corp. v. Newstress Int'l, Inc., 2007 VT 83, ¶ 6, 182 Vt. 282, 938 A.2d 1215; see In re C.P., 2012 VT 100, ¶¶ 18-19, 193 Vt. 29, 71 A.3d 1142 (concluding argument was related to subject-matter jurisdiction where party's argument concerned whether family division had authority to hear CHINS proceedings, which is a "general type of controversy"). When a court has jurisdiction over the general category of case, however, "the fact that the court errs in exercising its jurisdiction in a particular case within that general category" does not implicate the court's subject-matter jurisdiction such that preservation

5

is not required. In re B.C., 169 Vt. 1, 7, 726 A.2d 45, 50 (1999), abrogated in part on other grounds by In re C.P., 2012 VT 100, ¶ 24; see State v. Thompson, 2011 VT 98, ¶ 8, 190 Vt. 605, 30 A.3d 671 (mem.) (concluding that argument was not related to subject-matter jurisdiction where it concerned whether court "properly exercised its jurisdiction under the circumstances" of that case and not whether court had power to adjudicate that type of case at all).

¶ 12.    Defendant's challenge to this seizure does not relate to subject-matter jurisdiction. Defendant does not claim that the criminal division lacks authority to hear animal forfeiture cases in any circumstance. Indeed, it is expressly authorized to do so by statute. See 13 V.S.A. § 354(d) ("[T]he State may institute a civil proceeding for forfeiture of the animal in the territorial unit of the Criminal Division of the Superior Court where the offense is alleged to have occurred."); see also In re C.P., 2012 VT 100, ¶ 19 (recognizing court had subject-matter jurisdiction where power to hear general category of case was granted by statute). At most, defendant's argument is that the criminal division exercised its jurisdiction under § 354 in a way that exceeded that statutory authority by misapplying the meaning of "seizure" to his case. See 13 V.S.A. § 354(d) (allowing criminal division to exercise forfeiture authority when "an animal is seized" under § 354). Like in In re B.C., however, defendant's argument that the court wrongly exercised its forfeiture authority in his specific case is not a question of the court's subject matter jurisdiction to hear animal forfeiture cases in any circumstance. 169 Vt. at 8, 726 A.2d at 50; accord United States v. 73.26 Acres of Land Located at Town Road #4, 757 F. Supp. 17, 18 (D. Vt. 1991) ("[A] valid seizure is not . . . an absolute requirement for . . . subject matter jurisdiction."). Therefore, defendant was required to raise this issue below to properly preserve it for appeal. He did not.

¶ 13.    Because it was not raised below, we do not address defendant's § 354 argument on appeal. See Follo, 2009 VT 11, ¶ 14 (recognizing necessity of preservation before this Court will review issues). Doing so would belie the recognized purpose of preservation. As the State correctly argues, it could have taken appropriate action had it been aware of defendant's objection

to the exercise of forfeiture authority. For example, the State could have put on additional evidence on whether Chad was in fact "seized" or obtained a search warrant and refiled its forfeiture motion under § 354(d). Because defendant failed to raise his § 354 argument below, however, the State had no opportunity to address it. See Nash, 2019 VT 73, ¶¶ 15-16; Bogert, 2013 VT 13A, ¶ 29. We therefore decline to address this issue further. Cf. Tibbetts v. Michaelides, 2011 VT 52, ¶ 11, 190 Vt. 520, 24 A.3d 581 (mem.) (declining to review subject-matter jurisdiction claim because it was not raised below and thus "the record [wa]s simply insufficient to review [it]").

## II. Finding of Animal Abuse

¶ 14. Defendant next argues that the criminal division ordered civil forfeiture of Chad based on insufficient evidence of animal cruelty. Civil forfeiture requires a prerequisite finding that an animal was "subjected to cruelty, neglect, or abandonment in violation of section 352 or 352a." 13 V.S.A. § 354(f)(1). Relevant here, § 352 recognizes animal cruelty to include "[d]epriving an animal . . . of adequate food, water, shelter, rest, sanitation, or necessary medical attention or transport[ing] an animal in overcrowded vehicles." Id. § 352(4). "Adequate food" is defined as food "that is not spoiled or contaminated and is of sufficient nutritional content to meet the normal daily requirements for the condition and size of the animal." Id. § 351(16). "Adequate water," in turn, is "potable water that is either accessible to the animal at all times or is provided at suitable intervals." Id. § 351(17). "Sanitation" requires an animal's "enclosure," which includes "any structure . . . or other barrier used to restrict an animal . . . to a limited amount of space," receive at least "periodic cleanings to remove . . . waste materials, dirt, and trash." Id. § 351(9), (19). "Necessary medical attention," lastly, includes "treatment for injury, disease, excessive parasitism, dehydration, malnutrition, pain, or impaired locomotive function." Id. § 351(7).

¶ 15. To demonstrate animal cruelty sufficient to warrant civil forfeiture, the State must establish cruelty "by clear and convincing evidence." Id. § 354(f)(1). This standard of proof necessitates that "the existence of the contested fact[s]" be "highly probable." In re N.H., 168 Vt.

7

508, 512, 724 A.2d 467, 469-70 (1998) (quotation omitted). Although we have recognized it as a "very demanding measure of proof," id. at 512, 724 A.2d at 469, the threshold showing of animal cruelty does not require the same high burden as in the criminal context, see Lanfear v. Ruggerio, 2020 VT 84, ¶ 18, 213 Vt. 322, 254 A.3d 168 ("Clear and convincing evidence . . . require[es] somewhat less . . . evidence [than] beyond a reasonable doubt." (quotation omitted)). We have upheld findings of clear and convincing evidence of cruelty in a variety of circumstances, such as where animals were "denied drinking water for long periods," frequently restrained in small cages, and received inadequate medical care, State v. Ferguson, 2020 VT 39, ¶ 17, 212 Vt. 276, 236 A.3d 207 (quotation omitted), were inexplicably thin, suffered from "nutrient deficiency," and had received inadequate medical attention, State v. Bona, No. 2014-258, 2015 WL 196354, *3 (Vt. Jan. 9, 2015) (unpub. mem.) [https://perma.cc/G28Q-MSGQ], and were dehydrated, underweight, and had parasites, State v. Gentlewolf, Nos. 2006-231 & 2006-232, 2007 WL 5323075, *1 (Vt. Feb. 1, 2007) (unpub. mem.) [https://perma.cc/499X-SYVX]. By contrast, we determined that the State failed to prove cruelty based solely on evidence of ear infections, which "were common in . . . long-eared dogs" like the ones at issue in that case, and "the dirty and cluttered condition of defendant's home," which did not "present[] a health hazard to the animals." State v. Dufresne, No. 2009-317, 2010 WL 7795316, at *2 (Vt. Aug. 24, 2010) (unpub. mem.) [https://perma.cc/3QWK-AZ8B].

¶ 16. Here, the record supports the court's findings by clear and convincing evidence of cruelty sufficient to warrant forfeiture. Most notably, the court's findings underscored the multiple occasions Chad was found without access to water in defendant's car. This lack of water was exacerbated by the high temperature in defendant's car during both the April and June incidents. On April 15, the car's internal temperature had reached 97.4 degrees, and on June 8, the car had been left in the sun, with no air-conditioning, and barely opened windows, where Chad was found panting, with a swollen tongue, and in early stages of heat exhaustion. The court further relied on

the confined, trash-filled conditions of defendant's car, which gave Chad nowhere to lie down apart from a pile of garbage on one seat and left him unable to move about. Testimony credited confinement with causing Chad's lack of "muscle mass" and initial inability to run or maintain balance without falling, consistent with dogs who are often confined to too small spaces. The court also cited testimony that Chad was "underweight for his size" and suffered from a lack of nutrition on arrival at the Animal Center, which implied that defendant did not provide Chad an adequate diet. In fact, the court found defendant at least once attempted to feed Chad rotten food before a humane officer intervened. The court also found defendant's claim that Chad regularly received veterinary care doubtful and noted that Chad required medical attention when he arrived at the Animal Center, which the record shows included vaccines and parasite treatments. Considered together, this evidence is sufficient to support the criminal division's finding of cruelty by clear and convincing evidence.

¶ 17. Defendant counters that the court incorrectly concluded that he deprived Chad of food and water because the only evidence from which deprivation can be found are the April, May, and June incidents, and no facts show Chad was severely emaciated or dehydrated. We disagree. There is "no requirement in the statute" that defendant's actions "extend over a particular period of time to constitute animal cruelty," Gentlewolf, 2007 WL 5323075, *2, and a court "need not wait until the consequences" of abuse become severe before granting forfeiture, Bona, 2015 WL 196354, at *4. Additionally, that Chad is a Siberian husky, a dog bred for cold-climates and more susceptible to the heat, makes the absence of water and exposure to heat even stronger indicia of abuse. See 13 V.S.A. § 351(17) (recognizing "adequate water" depends on type of animal); see also Dufresne, 2010 WL 7795316, at *2 (relying on characteristics of dog breed in applying § 352).

¶ 18. Defendant further attempts to challenge the court's findings because it relied on a repealed definition of "adequate shelter" in its decision and allegedly misapplied the meaning of "overcrowded vehicle" under § 352(4), which defendant claims cannot logically apply to a vehicle

9

that contains only one animal. We again disagree. Although the court would have been more apt to focus on the definitions of "sanitation" and "enclosure," its misapplication of "shelter" and its alleged misreading of "overcrowded" are not reversible error because the court correctly found clear and convincing evidence of cruelty to support forfeiture notwithstanding. See Harlow v. Miller, 147 Vt. 480, 483, 520 A.2d 995, 998 (1986) ("[A] trial court can reach the right result for the wrong reason."). More broadly, because § 352's factors are disjunctive and any single adequate finding of cruelty may be sufficient, we need not address every possible form of cruelty under § 352(4) in the manner the court did here. See 13 V.S.A. § 352(4); see also In re Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 42, 199 Vt. 19, 121 A.3d 630 (recognizing that when statute's text uses "or" its terms should "be read disjunctively" (quotations omitted)). Even without the challenged items, the remaining findings are sufficient to support the court's determination.

### III. Admission of Temperature Estimation

¶ 19. Defendant lastly argues that the court erred in permitting Officer Murawski's testimony estimating the temperature inside defendant's car on June 8, claiming that this evidence was inadmissible lay witness testimony under Vermont Rule of Evidence 701. Where evidence was allegedly admitted in error in a civil case, a party must show not only that the court erred in admitting the evidence but also that the evidence's admission prejudiced them. Passion v. Dep't. of Soc. & Rehab. Servs., 166 Vt. 596, 597, 689 A.2d 459, 461 (1997) (mem.). Accordingly, we will not reverse if the alleged error was harmless. In re H.H., 2020 VT 107, ¶ 15, 214 Vt. 1, 251 A.3d 560. We apply the harmless error standard under the same standard of review that was applicable below. Ferguson, 2020 VT 39, ¶ 24. We therefore recognize an error as harmless in an animal forfeiture matter if we are "satisfied to a clear and convincing standard that the court would have reached the same conclusion" even without the challenged evidence. Id.; see, e.g., Baldwin v. State, 126 Vt. 70, 77, 223 A.2d 556, 561 (1966) (concluding admission of photographs, even if in error, was harmless because they were cumulative of other evidence).

10

¶ 20.    The admission of the temperature estimate here, even assuming it was in error, falls within the purview of harmless error recognized in Ferguson, 2020 VT 39, ¶ 24.  Even without Officer Murawski's estimation, there is ample evidence in the record to support the inference that the temperature in the car was both excessive and deleterious to Chad's wellbeing.  The temperature estimate pertained to only one of the three incidents, June 8, and the record provides an exact, unchallenged temperature reading of 97.4 degrees inside the car on April 15.  Although the court did cite Officer Murawski's estimate in describing the June 8 incident, the court also noted that defendant's car was parked in the sun, that its windows were effectively closed, and that there was no air conditioning running, all of which were unchallenged and imply that on June 8 "the temperature inside the [d]efendant's car with the dog was warmer" than the external temperature of seventy-eight degrees.  Chad himself also reflected signs of the car's high heat, as he was panting and had a swollen tongue when Officer Murawski found him, which Officer Murawski recognized as early warning signs of heat exhaustion in dogs.  More broadly, for the reasons discussed above, the complete record in this case reflects other clear and convincing evidence of cruelty sufficient to warrant forfeiture even without the temperature estimate, see supra ¶ 16, and the estimate was thus cumulative of the other unchallenged evidence presented.  Because the error, if any, in the decision to admit the temperature estimate was therefore harmless, no reversal is warranted.

Affirmed.

FOR THE COURT:

Associate Justice

11